GARVEY et al. v. CAIN, Co. Atty.   (No. 262.)

(Court of Civil Appeals of Texas.   Beaumont.
July 13, 1917.   Rehearing Denied
Oct. 10, 1917.)

1. INTOXICATING LIQUORS ⟐37—LOCAL OPTION—ELECTION CONTEST—EVIDENCE.
In a local option election contest, evidence *held* sufficient to support the court's finding that certain persons who voted were not legal voters, in that they lived outside the voting precinct.

2. APPEAL AND ERROR ⟐1010(1) — FINDING SUPPORTED BY EVIDENCE—REVIEW.
The Court of Civil Appeals will give to the findings of the court below the same weight that is accorded the verdict of a jury, and where such findings have the support of evidence they will not be disturbed on appeal.

3. INTOXICATING LIQUORS ⟐37—LOCAL OPTION ELECTION—CONTEST—JURISDICTION.
In a local option election contest, where the boundary line between the counties had never been recognized and established as required by Rev. St. 1911, art. 1400, the court properly heard evidence and determined the boundary, for the purpose of ascertaining whether certain parties who voted resided within the commissioner's district in which the election was held.

4. INTOXICATING LIQUORS ⟐37—LOCAL OPTION—BOUNDARY—EVIDENCE.
In a local option election contest, evidence *held* insufficient to show that a boundary involved had been recognized and established within in Rev. St. 1911, art. 1400, adopting such boundaries as the true boundaries.

5. INTOXICATING LIQUORS ⟐34(4) — LOCAL OPTION ELECTION—QUALIFICATION OF VOTERS.
The right of the electors to vote upon the question of local option depends on whether they reside within the county where the election is held.

6. INTOXICATING LIQUORS ⟐37—LOCAL OPTION ELECTION CONTEST—INTIMIDATION.
In a local option election contest, evidence *held* to support the court's finding that there was no intimidation of the voters calculated to change the result.

7. ELECTIONS ⟐71—QUALIFICATION TO VOTE—"RESIDENCE"—"USUALLY."
Under present election statute defining "residence" as actual physical living in a place, residence is a question of fact and not an abstract test of intention, and in case of a married man depends on where his wife resides, where she usually sleeps at night, while in case of a single man it depends upon where he usually sleeps at night; the proper interpretation of the word "usually" in this connection being that if the voter, a single man, when he is not actively engaged in his work, has a room or habitation to which he usually returns and where he usually sleeps at such times, then his right to vote in the precinct where such room or habitation is located is fixed by Terrell Election Law (Acts 29th Leg. [1st Called Sess.] c. 11) § 4, even though he should be there only a small per cent. of the time; but if it should also appear that by reason of the nature of his occupation he was required to adopt a different place as one where he usually sleeps, then his right to vote

⟐For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

at the former place is lost, and his right to vote would be governed by section 22.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Residence; Usually.]

Appeal from District Court, Liberty County; J. Llewellyn, Judge.

Contest suit by E. D. Garvey and others against C. H. Cain, County Attorney. Judgment for contestee and contestants appeal. Affirmed.

Geo. G. Clough, of Galveston, E. B. Pickett, Jr., of Liberty, and P. C. Matthews, of Cleveland, for appellants. C. H. Cain, of Liberty, J. L. Manry, of Livingston, and Townes & Vinson and McMeans, Garrison & Pollard, all of Houston, for appellee.

KING, J. This is a contest of a local option election held within commissioners' precinct No. 3, Liberty county, on September 11, 1916, for the purpose of determining whether the sale of intoxicating liquor should be prohibited by law within said precinct. The result, as found by the commissioners' court, was a majority of two votes in favor of prohibition. The statement of the contest was filed and served on the contestee within the statutory period, and on a trial in the district court, the court sustained the challenges of the contestant in part, and those of the contestee, on his counter-contest, in part.

The court rendered judgment in behalf of the contestee, holding that a majority of the qualified electors within said precinct had cast their votes for prohibition. It was agreed upon the trial that the election was regularly called; that notice was posted, and that due returns were made; and that the commissioners' court met and canvassed the returns, and determined the result properly, and duly entered an order declaring said result, which was published by the county judge of Liberty county in a newspaper published in said county; that the contestants were all duly qualified voters of said district; that said district contained four voting boxes, namely, Cleveland, Tarkington, Dolen, and Hightower. There were 566 votes cast at the election, as found and declared by the commissioners' court, 284 votes being cast for prohibition, and 282 against it. The contest of appellants involved a great many votes cast, and, besides, raised the question of intimidation of voters, as affecting the result of the election.

The contestee filed a counter-contest, involving several votes cast in the election, among which are 13 voters whom contestee alleged lived outside the territorial limits of said precinct, and within the limits of Montgomery county. These particular 13 voters resided at Fostoria, a sawmill town located at or near the line between Liberty and Montgomery counties, the mill proper, and most of the employés living, beyond question, within Montgomery county, and the controversy over the legality of said 13 voters grows out of confusion as to the true location of the boundary line between said counties.

[1] Error is assigned by appellants' first, second, third, fourth, and fifth assignment of errors to the action of the trial court in sustaining contestee's challenge to the 13 voters alleged to have resided in Montgomery county.

The findings of the trial court are as follows:

"Owing to the general interest manifested in this litigation I deem it proper to reduce to writing some of my conclusions of fact and law which I think compel the judgment entered herein.

"The contestants first claim that the officers intrusted with the duty of holding this election failed to keep the polls open until 7 o'clock, sun time. The testimony conclusively shows that the polls were closed at not later than 7:05 or 7:07 according to railroad time. I am inclined to think that solar or sun time should be the time used in opening and closing election polls. I find that John Gossey, Pleas Prelems, and Ben Ridley were near the polls, and would have voted an anti-prohibition ticket had the polls remained open until the legal closing time. These votes were, therefore, illegally denied contestants.

"Another complaint made by contestants is in regard to the use of an affidavit shown to have been used at at least some of the voting boxes in this election. The election law provides for the use of only one form of affidavit. I doubt that the voters should be required to sign any affidavit other than the one specifically authorized by law. Contestees admit that this particular affidavit was not in accordance with the law in one particular at least. The affidavit complained of required the voter to swear that no person or corporation had furnished him the money with which to pay his poll tax. It is conceded that, even if the poll tax was unlawfully procured, that fact would not, of itself, make illegal the vote cast by the holder thereof. Election officers are given no authority to question voters except as to facts touching their right to vote. They have no inquisitorial powers as has a grand jury. If they had no right to demand the making of this affidavit by the voter, clearly he had the right to refuse to make it, and if they required the making of the affidavit as a prerequisite to voting, and the voter did not agree to submit to an illegal demand on their part, he was clearly within his rights, and a refusal to allow him to vote unless he signed such an affidavit was illegally denying him the right to vote.

"I think Aaron Franklin, Austin Reeves, and George Gilmore were entitled to vote in this election. I gather from the evidence that they were refused the right to vote because they would not sign the affidavit in question. I therefore conclude that they were illegally denied their right to vote. Marion Ott, Charles Poole, and Frank Evans do not appear to have been legally qualified to vote.

"Memphis Murray testified, in effect, that he was told by an agent of the Foster Lumber Company that if he was not there at 7 o'clock that he would have to move the next morning. Taking into consideration all the circumstances, I think Murray was intimidated.

"The law requires that each voter vote in the precinct of his residence. This requirement is mandatory. It is shown by the uncontroverted evidence that eight residents of various precincts voted for prohibition in voting precincts other than that of their residence. These votes being illegally cast should be deducted from the total of the votes cast for prohibition. I think that D. D. Page, alleged to be an illegal

voter on this account, was a legal voter, and that his vote should be counted.

"The testimony tends to show that Steve Franks was told by some one that he could not vote unless he had with him a poll tax receipt. I am not inclined to hold that a mere misstatement of the law alone amounts to intimidation.

"Complaint is also made that certain parties who are shown to be on the pauper list of Liberty county were not allowed to vote, being otherwise qualified voters. I do not think that any one on the pauper roll of the county has the right under the law to vote, though they be only partially supported by the county.

"From what is said above it will be noted that eight votes actually cast in this election for prohibition were illegal, and that seven voters were illegally deprived of their right to vote. If the evidence stopped here, this would of course overturn the declared result as made by the commissioners' court. The contestees, however, attack a number of votes shown to have been cast against prohibition. I sustain the challenges, based on various grounds, to the votes cast by the following voters, to wit: Melton Davis, Dan Smith, Charles Sandford, Jim Denson, W. T. Whitten, Marion Whitmire, R. F. Tennyson, Douglass Boothe, W. W. Smith, Ed Taylor, Leon Scott, and H. B. Johnson. I overrule the challenges of contestees as to the following anti voters: Charley Smith, J. L. Isaacks, G. B, McShan, Marion McIlvain, Lum Hudson, Elmo Williams, J. M. Evans, and Will Atkinson. The qualifications of some of these last named are somewhat doubtful, but the burden of proof as to this was upon contestees, and election laws should be liberally construed and applied. No citizen should be denied the franchise unless it be clearly apparent that he is not a qualified voter.

"The votes challenged by contestees should be deducted from the total of the votes cast against prohibition. This would leave the result still in favor of prohibition by votes actually legally cast and counted, but the result of the election would be doubtful by reason of the fact of the voters mentioned above being illegally denied the right to vote.

"This brings us to the consideration of the boundary question, which if decided in favor of the contestants would require the setting aside of this election, but if decided in favor of the contestees, the election should be sustained. Upon this question I quote the following from contestants' brief:

"'The evidence before the court upon this question establishes only one fact with certainty. And that one fact is that for many years the true location of the boundary line between Montgomery and Liberty counties has been uncertain; and that such uncertainty yet continues; that for years back and now there is dispute and disagreement regarding which line upon the ground is really the true boundary line.'

"The above aptly expressed the only conclusion that can be arrived at from the evidence introduced in this case. There is therefore between Montgomery and Liberty counties, near Fostoria, no line definitely marked and known and generally recognized. The boundary line between Montgomery and Liberty counties, so far as the proof shows, has never been legally established in any of the manners provided by law. This is not a suit between Montgomery and Liberty counties to determine the location of this boundary line and in this case we cannot legally establish the boundary line so as to be hereafter binding on every one. The question we have to determine in this case is whether or not certain voters living on the 'disputed strip' actually lived in Montgomery county or Liberty county. If there had ever been a line legally established in the manner provided for by law, that line would determine the county in which these voters lived. In the absence of a legally established or a generally recognized line settling the question as to where these voters lived, their place of residence must be otherwise determined. Legally speaking, there can be no 'No Man's Land' of uncertain breadth or length lying between Montgomery and Liberty counties. These voters, as a matter of fact, live either in Liberty county or Montgomery county. If they live in Liberty county they are entitled to vote in this election; if they live in Montgomery county they have no voice in a prohibition election in Liberty county, and their votes if cast in an election in Liberty county would be illegal votes. They must vote in the county and precinct of their residence and have no right to vote elsewhere. If they live in Montgomery county legally speaking they have no concern as to the question of whether commissioners' precinct No. 3 of Liberty county should be wet or dry. The status of the territory where they live, if they live in Montgomery county, is not affected by the result of an election in Liberty county. The fact that one who lives in Montgomery county has customarily voted in Liberty county illegally does not give him the right to continue to do so indefinitely. It would not be wrong to deny him the right of suffrage in Liberty county because he did not have the right in any event to vote there. The question to be decided is simply did these voters in the 'disputed strip' near Fostoria reside in Liberty or Montgomery county. As we have no generally recognized line, nor one established in any of the manners provided for by law, in determining this question we are necessarily relegated to other proof as to the actual boundaries of the two counties in question. Under such circumstances I think that the statutory description is the one that must govern. In the absence of a legally established line, or a generally recognized line, the statutory line must be the true line. The only evidence in this record that throws any light on the true location of the statutory line between the counties involved is that given by Mr. Compton. By his testimony the north end of the line, if set at a point from which a line run south to the head of Cedar bayou as same existed, as nearly as can be determined, would place this 'disputed strip' in Montgomery county. The head of Cedar bayou, as it existed in 1837, is necessarily somewhat doubtful, but any line drawn from the certain statutory north end of this line to the fartherest western point that the head of Cedar bayou could possibly have been in 1837 would still leave this 'disputed strip' unquestionably in Montgomery county.

"It being clearly and unequivocally settled to a mathematical certainty by actual measurements made by Compton that this disputed strip is in Montgomery county, it necessarily follows that the votes cast by the 13 negroes living in the 'disputed strip' against prohibition were illegal votes, and should be deducted from the total vote cast against prohibition in the election under consideration. These votes being deducted from the total of those cast against prohibition leave the majority for prohibition too many to render the election uncertain, by reason of voters being intimidated or denied the right to vote. The evidence, instead of showing a possibility of other voters than those named as being intimidated or denied the right to vote, rather establishes the fact that there were no other voters intimidated or denied the right to vote. A larger vote seems to have been cast at this election than any heretofore held in that territory. This tends to indicate that everybody that desired to vote in this election actually voted. Before an election can be set aside on the ground of intimidation of voters, or because legal voters were not allowed the right to vote, it must reasonably appear from the evidence that a sufficient number were thereby denied the right to vote, which, had they voted, would probably have changed the result. To make such a finding in this case would not be based upon any

evidence, but would be rather against the evidence.

"The purpose of every election is to determine the will of a majority of the voters legally entitled to vote in the election. From what has been said above, it clearly appears that prohibition has been carried in this election by a clear majority of the legal votes actually cast. There seems to be but little probability that any voters, other than those mentioned, were deprived of the right to vote, or were prevented from voting. Certainly it cannot be determined from the evidence that there was enough of these to render the result in any wise doubtful.

"From what has been said it follows that the declared result must be sustained, and judgment will be accordingly entered."

We overrule these assignments of error. The evidence shows, without dispute, that each of said 13 voters lived west of the Compton line, so that, if that be the true line, or if the true line be no further west than that, then all of these voters were disqualified. The result of the finding of the trial court is that, as a matter of fact, the 13 voters in question lived in Montgomery county, and not in Liberty county.

[2] This court will give to the findings of the court below the same weight that is accorded the verdict of a jury, and where such findings have the support of evidence, they will not be disturbed upon appeal. The trial court was the exclusive judge of the credibility of the witnesses, and of the weight to be given their testimony, and this court would not be authorized to disturb the judgment of the trial court, unless we could say that such findings and judgment are so opposed to the overwhelming weight of testimony as to be manifestly wrong. Before we could say that the trial court erred in sustaining the challenges of the contestee as to the 13 voters alleged to reside in Montgomery county, we would have to find that there was no evidence that justified the finding of the trial court that such parties lived in Montgomery county, and were not legally qualified voters in Liberty county. We hold that the testimony of the civil engineer, Compton, as well as the testimony of the witnesses E. C. Smith and others, were sufficient to show the location of the true boundary line between Montgomery and Liberty counties, and the court's finding that the line testified to by said witnesses was the true line, and that said 13 voters actually lived on the Montgomery side of such line, is sufficient to support his finding and judgment. From the finding of the trial court, which is amply supported by testimony, the boundary line between Montgomery and Liberty counties has never been actually surveyed and marked upon the ground, in accordance with law, and evidence tending to show where such line really is, was admissible; and the court having accepted as true the testimony of the civil engineer, Compton, showing the location of said line, and having found in accordance therewith, the finding will not be set aside.

There was evidence in the record that some 20 years ago Mr. Eubanks, a county surveyor of Liberty county, made a survey of the land, and marked it with four hacks; also that some 10 years ago a surveyor by the name of McMicken ran a line; but that neither of these two lines was consistent with the statutory description of Liberty county, in that the controlling call in the boundary line is the head of Cedar bayou, as it was in 1837, and neither of said lines, if followed, would touch the head of Cedar bayou.

It is contended in appellants' first proposition, under the first assignment of error, that where a boundary line was in dispute, and was uncertain and could not now be definitely established, and it was shown that a certain line had been recognized and acted upon by residents of both counties as being the proper line, and taxes paid, roads worked, and children sent to school with reference thereto, and that voters generally had voted in various elections with reference to such line being the true boundary, and where it was further shown that there was an old boundary line marked upon the land many years previous by a county surveyor, and that an extension of such line would be consistent with the recognized line, it was error for a trial court to reject such facts and recognition, and to adopt as the true boundary line an arbitrary line run by a surveyor, based upon his own judgment as to where a natural object was in 1837, it being admitted by the surveyor that such natural object, at the time he ran the line, was at least five miles distant from where he located it as he thought it was or ought to be in 1837.

By their fourth proposition under the first assignment of error, appellants contend that where the trial court found that a boundary line was in dispute, and not definitely marked on the ground, and not capable of being located with any degree of accuracy, the trial court was not authorized to arbitrarily establish a boundary line, and to hold voters living at and near the boundary line to be illegal voters in such election.

The main case relied upon by appellants to sustain these propositions is Ralls v. Parish, 151 S. W. 1092, in which is quoted with approval the case of Quinn v. Lattimore, 120 N. C. 426, 26 S. E. 638, 58 Am. St. Rep. 797.

[3] Appellants' position seems to be that this court cannot determine, in this suit and for the purpose of this action, where the county line is, or whether it is west of the Compton line or not. No authority is cited in support of this contention. The courts have held that the statutory method, as provided by the act of 1897 (Acts 25th Leg. c. 157), once pursued, exhausts the jurisdiction of the county court to locate a county line upon the ground, but that question is not involved here, for the records of Liberty county and of the general land office show, without dispute, that this line was never so located.

Article 1400 of our present Revised Statutes reads as follows:

"The county boundaries of the counties in this state, as recognized and established, are adopted as the true boundaries of such counties, and the acts creating such counties and defining the boundaries are continued in force."

If it had been established as a matter of fact in this case, by contestants, that the boundary line in question had been "recognized and established" prior to 1895, within the meaning of the terms of that statute, we could not now undertake to say that the boundary line was properly located elsewhere under its statutory field notes. The evidence in this case, both by appellants and appellee, establishes the fact that the boundary line in question was never "recognized and established" within the meaning of that statute. The meaning of the statute is determined in the case of Stephens County v. Palo Pinto County, 155 S. W. 1006, as follows:

"It was the purpose of the act quoted to quiet all controversies over county boundary lines where, at the time the act took effect, such lines were established (that is, definitely marked and known) and recognized, irrespective of the accuracy of such surveys."

In this case, a number of witnesses were put upon the stand by the contestants, in the effort to prove the recognition of some one line.

[4] We do not think that the evidence is sufficient to show that any line has ever been recognized and established between Liberty and Montgomery counties. There were some slight individual recognitions of different lines, but, taken as a whole, the evidence amply supports the finding of the trial court that no such line was ever recognized and established. This being the case, the trial court was compelled to hear evidence as to the true location of the line between the two counties, which he properly did, and determined from the evidence, as an issue of fact, that the 13 challenged voters resided outside of the county of Liberty.

In Short v. Gouger, 130 S. W. 267, which was an election contest case, the court held that that was certain which could be made certain, and that the court might ascertain the location of the line as a matter of fact, and that, under such circumstances, the matter might be inquired into in an election, for the purpose of ascertaining whether a voter had resided within the limits of the town.

In the case of Lampasas County v. Coryell County, 27 Tex. Civ. App. 195, 65 S. W. 67, the court held that the true boundary line between the two counties was an issue of fact to be determined by the evidence, without regard to the validity or invalidity of the several orders and proceedings under which the several surveys in evidence had been made.

The case of Ralls v. Parish, supra, does not support the propositions laid down by appellants. The question involved here was not involved in that case. The court states that no contention was made that no voter who voted in the election resided outside of the boundaries. The sole question there was as to whether voters conceded to have resided within the boundaries were to be disfranchised and the votes of an entire polling box cast out, by reason of the fact that the polling box itself had been placed within a few feet of the disputed territory. This was the sole question involved, and the court properly held such placing of the polling box would not disfranchise the voters. Precisely the same question was decided in Ex parte White (Tex. Cr. App.) 28 S. W. 542, the only difference being that one applies to the county boundary line and the other applies to voting precinct line. Neither does the North Carolina case, to which reference is made, and from which quotation is made in the Ralls Case, support the contention of appellants. The North Carolina case was an action of quo warranto for the purpose of trying title to the office of clerk of the superior court, resulting from an election held in 1894. In passing upon the election contest, it appeared that there was a class of voters who lived on or near the dividing line between two townships, who voted in a different township from that in which they lived. These votes were allowed by the referee to whom the case was referred. A number of these votes which had been allowed by the referee were rejected by the court, and the court found and made a part of the judgment that the parties had voted in bad faith in the wrong township, and the plaintiff contended that this finding of bad faith was without any evidence to support it. It appears that one or two of these voters asserted that they knew at the time of the election that they did not live in the township in which they voted. The court simply held that if these parties lived only a few yards from the line, and had voted in the township before, and sent their children to school in that township, that the evidence was not sufficient to show bad faith, since they were entitled to vote somewhere, and said: "Their votes would have counted just as much as they did, if they had been cast in the township where the defendant contends that they should have been cast."

The testimony of the witnesses in this case, it is true, establishes the fact that these 13 voters paid their poll taxes in Liberty county, some of them had worked the road in Liberty county in recent years, and that they had theretofore voted on a road bond issue at Cleveland, in Liberty county; but the evidence does not show, even if that would control their right to vote, that voters residing in what is known as the "disputed territory" had uniformly paid their taxes, sent their children to school, and voted in Liberty county, but, on the contrary, the evidence shows that voters living where these voters lived had, at times, been assessed in Montgomery county, and at other times in Liberty county.

[5] We hold that the right of these voters depends upon whether they lived in Montgomery county or Liberty county at the time of the election. If they lived in Liberty county, their votes were legal, and if they lived in Montgomery county, their votes were illegal. The matter being voted upon did not concern, in a legal way, the citizens of Montgomery county. The question as to whether or not intoxicating liquors should be prohibited in commissioners' precinct No. 3 in Liberty county, under the law, should have been determined by qualified voters of said precinct. The court below having found that the line run by Compton was the mathematically correct line between Montgomery and Liberty counties, Compton's testimony, as well as the testimony of other witnesses contained in the record, amply sustains the finding, and we cannot say that it is without evidence to support it.

"The same presumptions are indulged in favor of the judgment of the court on questions of fact, which obtain in support of the verdict of a jury." Flanagan v. Oberthier, 50 Tex. 382.

The sixth assignment of error is to the effect that the court erred in holding the election legal, and in rendering judgment in favor of contestees, because the overwhelming preponderance of the evidence shows that there was a general conspiracy of intimidation to deprive persons suspected of voting the anti-prohibition ticket from voting, and that, as a result thereof, many persons were deprived of the right to vote in the election.

By the seventh assignment of error, appellants complain of the action of the trial court in holding that the use of the illegal affidavit at the polls on election day was not such an illegal act and an intimidation of voters as rendered the election void.

By the eighth assignment of error, appellants complain that the trial court erred in rendering judgment for the contestees, the proof showing that the election was fraudulently and illegally conducted, and that, by reason of such fraud and illegality, such number of legally qualified voters were deprived of their votes to have changed the result of the election.

By the ninth assignment of error, appellants complain that the court erred in finding and holding that there was no intimidation of voters in the holding of the election, and that the election was not void by reason of the alleged intimidation.

[6] We overrule these four assignments of error. The evidence amply supports the judgment and findings of the district court that there was no general conspiracy of intimidation to deprive persons expecting to vote the anti-prohibition ticket from voting, or to obstruct the polls, or disregard the general election laws.

The evidence amply supports the finding and judgment of the court that the use of the affidavit in question did not result in any intimidation of voters such as would render the election void, or would affect the result, and if, in fact, any voters were intimidated or deprived of the right to vote by reason of the use of such affidavit, the court in its judgment and findings held such voters illegal, and, therefore, if the election officers or any of them adopted an erroneous affidavit in regard to the qualification of voters, the evidence does not disclose that it affected more than two or three votes, and to these the court sustained the contestants' challenge, and excluded them from the final result.

It is shown by the evidence of both sides that there was a guard stationed over a hundred feet from the polls, a gatekeeper, and that he was put there by the officers of the election. The evidence further discloses that it was agreeable to both sides, and that it was agreed by both sides that a rope should be stretched 100 feet from the polls, in order to keep people from approaching nearer to the polls than 100 feet, as provided by statute. We think that the evidence is ample to sustain the finding of the court that there was no general conspiracy of intimidation to deprive parties suspected of voting the anti-prohibition ticket from voting. The evidence discloses the fact that both sides, pro and anti, were very enthusiastic, but we find that the evidence amply supports the finding of the court that nothing was done that would affect the final result of the election. It is shown by the evidence that the largest vote was polled that had ever been polled theretofore in a local option election in that territory, and we find nowhere in the record that any person who desired to vote the anti-prohibition ticket was unlawfully deprived of that privilege. The officers of the election were equally divided as to antis and pros, and both sides were asserting every legitimate influence to carry the election according to their respective wishes. The fact that, without the limit prescribed by law, women and children congregated and sang and prayed would not be sufficient to show that any voter was deprived of his constitutional prerogative of casting his vote uninfluenced. It is a matter of common history that questions of this character incite the greatest enthusiasm on each side, and we know of no rule of law that would prevent women and children, or any other citizens, as to that matter, when they maintain themselves at a legal distance from the polls, comporting themselves in a lawful manner, to electioneer and insist that the voter cast his vote in accordance with their wishes. We find no conduct upon the part of women and children that was calculated to illegally influence the election, but find that they were clearly within their rights upon that occasion. We, therefore, adopt the findings of the trial court, that there was no intimidation of voters in this election that was calculated to change the result.

With reference to the affidavit required of voters, we beg to say that this affidavit

Tex.)                    GARVEY v. CAIN                    771

was more onerous than the law permitted, but we hold that the finding of the trial court is correct upon this issue. It appears that the trial court held in favor of contestants as to the voters who refused to make the affidavit, and that although the affidavit was one unauthorized by law, that there were not sufficient voters who refused to vote upon that account to change the result, the trial court having held in favor of contestants as to the voters who refused to subscribe to the unlawful affidavit.

The eleventh assignment of error complains of the action of the court in finding and holding that Ed Taylor was not a legal voter in this election, and in sustaining the challenge of the contestees to such voter.

We hold that the record amply supports the finding of the court that Ed Taylor was not a legal voter in the election. Joe Vanier testified on this point as follows:

"I know Ed Taylor; I got acquainted with him after he moved up there. He moved across the Liberty county line over in Hardin county a little piece. He did not live very far across the Hardin county line, but it was across it. I never did measure the distance he was in Hardin county. Guessing at it, I would say that he lived about a quarter of a mile over in Hardin county. I couldn't tell you who moved over there with him, but his wife was over there with him, and he had two children with him. They moved over there somewhere about the 10th of August, to the best of my remembrance. They stayed there until—that is, his wife stayed there until October; don't know exactly what time of October, but it was in October. Some time in September he moved back across the river and stayed there about two weeks or 10 days and then came back to see his wife at the camp. His wife all that time was living in Hardin county. They were living in a house there, a little house a Slavonian had built there for a camp, a board shack. They had their children there with them. They had some chickens and some hogs, three or four head of hogs, and had a few head of cattle."

Appellants' twelfth assignment of error is to the effect that the court erred in finding and holding that H. B. Johnson was not a legal voter in this election, and in sustaining the challenge of contestee to such voter. This assignment is overruled, as the trial court found that he was an illegal voter, and the testimony supports such finding. B. H. Kelly testified as follows:

"I know H. B. Johnson. My understanding is that he stays at the camp of Joe Vanier; he has been there something like—from the first of August of this year. He has been getting his mail there at Votaw ever since about the first of August, or, at least, he has been asking for mail there since about that time. He was making staves out there at the camp. It is my understanding that he came there from Cleveland, or near Cleveland. He is a single man. My understanding is that his old home is in Polk county.

"That is the same camp Ed Taylor stays at. Yes, sir; I know Ed Taylor, and he lived out there at the same camp where Johnson does. He also came there about the first of August of this year. I don't know just when he left that camp, but I think he moved away from there about a month ago, or something like that. I don't know where he moved to, but I think he moved across the river, over about Dolen somewhere. That was about a month ago, and

then he came back again, I understand, since then, and I think he is probably running the boarding house for the new well out there. All during the time Ed Taylor was out there he got his mail at Votaw. He has mail there in the office now. His wife had a couple of letters in the office when I left. * * * Ed Taylor went to that camp about the first of August, and since then he has moved to Dolen, and is now back at the camp again."

Appellants' thirteenth assignment of error in the action of the trial court in finding and holding that Marion Whitmire was not a legal voter in this election, and in sustaining the challenge of contestee as to such voter.

We hold that the testimony is amply sufficient to sustain the finding of the trial court that said Whitmire was not a legal voter. Tom Godejohn testified as follows:

"I know Marion Whitmire, and know where he was living in the early spring of this year; he was living at Humble. I don't know how long he lived at Humble, but he lived there a month, or so, or maybe longer than that. I saw him while he was down there. I was in Humble and saw him there. He is a married man, and he had his wife with him at Humble. I don't know what county Humble is in. When he left Humble he went to New Caney, but I don't know just when he moved to New Caney, but it was some time this past year, in the summer. This summer; this last summer. I did not see him at New Caney, and I did not talk to either he or his wife while they were at New Caney, but I talked to them after they left there. I talked to him at his home—where he moved to after he left New Caney, out there about the tram at the hardwood camp. As near as I can tell you, that camp is located where the tram crosses the East San Jacinto river. That tramroad runs east of New Caney, I suppose. He was living there at the camp. When he moved to Humble he moved from his old place that he sold to Boyd. He moved to Humble immediately after he sold it. From there to Humble, and from Humble to Caney, and from Caney to this camp."

Appellants' fourteenth assignment of error complains of the action of the court in finding and holding that W. W. Smith was not a legal voter in this election, and in sustaining the challenge of contestee as to such voter. L. M. Tanner testified on this point as follows:

"I know a man named W. W. Smith, commonly known as Buck Smith, and have known him ever since I was in Cleveland, which is since 1901. Buck Smith lived the first part of this year, and a greater portion of last year, up in Northwest Texas somewhere, but I do not remember the name of the county he was in; he was with his daughter. I do not recollect just what time it was that he returned to Cleveland, but my recollection is that it was some time in March or April of this year; I am not certain as to the exact date. When he came back I had a conversation with him with reference to where he was living. When he came back he came in my place and I talked a good deal with him, and he said he had been living with his daughter up in Northwest Texas, and that he came back from there on account of his eyes; that the glare up there was hard on his eyes, and he was about to go blind; and that the spring and summer was coming on and he couldn't stay there another spring and summer.

"I don't know just when it was that this fellow Smith went up to Northwest Texas to his daughter's, but it was right after that narcotic law went into effect. The first thing I knew I

heard he was gone to his daughter's. That was shortly after the narcotic law went into effect."

C. W. Carlisle testified:

"W. W. Smith and Buck Smith are one and the same man. They call him 'Old Uncle Buck.' "

W. W. Smith testified:

"My initials are W. W. Smith, but nearly everybody calls me Buck Smith. I have been called Buck Smith ever since I can recollect. I voted at Cleveland during this last prohibition election."

[7] Our present statute seems to clearly enough define what is meant by "residence," that is, actual physical living in a place, thus furnishing a test which can be practically applied by election officers and courts, a test of fact, instead of an abstract test of "intention," which necessarily could not be applied by any one except the voter himself, and by him in as many different ways and in reference to as many different places as might suit his convenience at different times. In other words, if it is to be left as a matter of intention at all, the statutory definition of "residence" is wholly illogical and unnecessary, for the voter can claim a residence anywhere, and the facts would have no bearing upon the matter. If the facts of physical presence are to be given any significance whatever, then there can be no warrant for giving them any degree of significance short of that plainly called for by the statute, that is, a significance exclusive and controlling.

That the statute meant what it said, and did not mean that the question of "intention" should enter into the matter of residence, is clearly shown by the exception to the general rule, which did not exist in the old law, but which has been added to it by the present law, namely, the exception to the departmental clerks, college students, etc. If the rule contended for by contestants had been intended by the Legislature, there would have been no need for this proviso. Every college student and every departmental clerk in Texas could have qualified as a voter at his former home, without any trouble whatever by all of contestants' tests, without the necessity of this proviso. The Legislature, however, intended to lay down a test of actual fact as applied to actual physical residence, conceived that it had done so, and that it was necessary to make this exception in favor of those particular classes of voters, by a proviso to the general rule. Linger v. Balfour, 149 S. W. 797, and Savage v. Umphries, 118 S. W. 893, both adopt this view and enforce this rule.

The former case contains a recognition also of the exception above mentioned, as called for by an assignment of error in that case, based upon the challenged vote of a university student. In this instance, the voter was a single man; he went to Oldham county in the summer and stayed there for a time. That being the place where he "usually slept at night," he became thereby a "resident" of that place and county. From there he went to Austin as a student in the University; therefore, his residence during all his stay at Austin was, under the statute, to be construed to be where his home was before he became such student, that is, in Oldham county, where he last "usually slept at night," unless, in the language of the statute, he became a bona fide resident of the county where he was such student. On this last question, that is, as to whether or not he had become a bona fide resident of Austin, by reason of his physical presence in that place, his intent in going to Oldham county became material as illustrating his intent in being in Austin. This decision, therefore, gives to the matter of "intent" its full force in the only connection in which it has any force in considering the question of the man's place of residence within the state of Texas, namely, the bona fide vel non of the residence of one of the members of an excepted class in his exceptional place of residence.

The test of a single man's residence within the state, at any given time or during any given period of time, is one purely of fact, and is found in the answer to the question: "Where does he usually sleep at night?"

The proper interpretation of the word "usually" in this connection is that if the voter, a single man, when he is not actively engaged in his work, has a room or habitation to which he usually returns, and where he usually sleeps at such times, then his right to vote in the precinct where such room or habitation is located is fixed by section 4 of the Terrell Election Law, Act of 1905 (Acts 29th Leg. [1st Called Sess.] c. 11), even though he should be there only a small per cent. of his time; but, if it should also appear that by reason of the nature of his occupation he was required to adopt a different place as one where he usually sleeps, then his right to vote at the former place is lost, and section 22 would govern his right to vote.

The test as to where a married man resides within the state of Texas, at a given time or during any given period of time, is also purely one of fact, and consists of an answer to the question: "Where does his wife reside?" "Where does she usually sleep at night?"

Of course, a wife may, like a single man, be away temporarily or sleep for some period at another place than that where she usually sleeps; but if she has a fixed, definite abode to which she comes back, and where she then sleeps after any such enforced temporary absence, the latter remains her residence, and under the terms of the Terrell Election Law, the residence of her husband, not by reason of her "intention" or claim, or the leaving of some personal effects there, but solely by reason of the maintenance, throughout the period, of an abode there to which she may at any time return and where she may at any time resume her actual living. This furnishes the distinction between

the two cases dealt with respectively in paragraphs 37 and 38, in Linger v. Balfour, supra.

This is clearly the principle announced in the case of Aldridge v. Hamlin, 184 S. W. 602, though the court appears to have rendered an opinion, some few paragraphs of which are inconsistent with the remainder of the opinion. The holding of the court as to the voters Dodson and Stafford in paragraphs 15 and 16 are inconsistent with the announced principles upon which the other challenges are decided in the same case by the same court; the court in these two latter instances seeming to take refuge in the finding of the trial court in regard to these two voters, and citing authorities to sustain the contention that the appellate court could not disturb such finding.

It is obvious that there is no way to reconcile all the holdings of the courts in all of the cases on this question of residence. The cases exist and the inconsistencies exist, and there is no principle upon which they can be completely and universally reconciled. It remains, therefore, to take that rule of decision which seems best supported by the language of the statute itself, and best supported by the context of the statute, as viewed under the usual rules of construction in regard to provisos and exceptions, and as apparently best supported by the authorities of the courts. It is certainly more consistent with the language of the statute, and is in accord with the legislative construction of that statute, as shown by the insertion of the proviso as to college students, departmental clerks, etc.

The returns of the election declared by the commissioners' court was 284 for prohibition and 282 against prohibition. The court found that eight votes which had been cast for prohibition were illegal, and to this finding there is no assignment of error. The court also found that seven antiprohibitionists had been denied the right to vote, and to this finding there is no assignment of error. This would leave the result of the election at 13 votes majority against prohibition. The court sustained 12 of the challenges of contestee of parties who had voted against prohibition, to only four of which, as shown by appellants' assignments of errors Nos. 11, 12, 13, and 14, any exceptions were taken. This would leave a majority of one against prohibition. The trial court found that 13 parties who voted against prohibition, designated as the Liberty county boundary controversy voters, were illegal, and this finding of the court leaves the result of the election of a majority of 12 in favor of prohibition, four of whom are challenged by the above-named assignments of errors, so this court, sustaining the finding of the trial court as to the 13 voters involved in the boundary controversy, would still leave the election at a clear majority in favor of prohibition. We, therefore, affirm the judgment of the lower court, and hold that a majority of the legal votes of commissioners' precinct No. 3, Liberty county, was cast in favor of prohibition.

Affirmed.