**MAJOR et al. v. LOY, County Judge, et al.**

**No. 2183.**

Court of Civil Appeals of Texas. Eastland.

Oct. 17, 1941.

618

B. F. Gafford and Brame & Brame, all of Sherman, for appellants.

R. C. Slagle, Jr., Dist. Atty., and Head, Dillard, Maxey-Freeman & McReynolds, all of Sherman, for appellees.

FUNDERBURK, Justice.

This is an election contest proceeding brought by J. C. Major and two other residents of Grayson County and of Common School District No. 15 in said county, as contestants against R. C. Slagle (Criminal District Attorney), and others, including Jake J. Loy, County Judge of Grayson County, all residents of Grayson County, as contestees. The election was one held July 27, 1940, in Common School District No. 15, otherwise called, and hereafter referred to as, Elmont School District, to determine a question of the consolidation of said district with the Van Alstyne Independent School District. The result of the election, according to official returns, as canvassed and declared, by the Commissioners' Court of Grayson County, was 38 votes for consolidation and 34 votes against consolidation. Upon hearing the contest, the court adjudged there were 36 qualified votes for consolidation and 34 votes against consolidation, thus, in effect, overruling the contest. The contestants have appealed.

Among the votes challenged by contestants was that of Alta Neill, who was found not to have been a qualified voter, and whose ballot was number 3. It was concluded, however, that since, of 72 votes cast in the election, two were numbered 3—one

for consolidation and the other against consolidation,—there was no evidence that Alta Neill voted for consolidation, and, therefore, her vote was not deducted from the total number voting for consolidation. This finding and conclusion are duly challenged.

■ The contestees, as well as contestants, alleged that Alta Neill was among those voting for consolidation. But for the fact that such allegation by contestees (occupying the status of defendants) followed a general denial it would be conclusive of the fact so alleged. Generally one party to a suit is under no necessity of proving a fact alleged by the adverse party. There is an exception to this rule, however, where an allegation of the defendant's answer of a defensive nature follows a general denial. 33 Tex.Jur. p. 645, sec. 189, and authorities cited; Hynes v. Packard, 92 Tex. 44, 45 S. W. 562; Silliman v. Gano, 90 Tex. 637, 39 S. W. 559, 40 S.W. 391; Grand Lodge v. Walker, Tex.Civ.App., 86 S.W.2d 839, and authorities cited.

■ It seems to be true that although Alta Neill was a witness she was not asked how she voted, nor did she, or any other witness, testify how she voted. Such omission is very reasonably accounted for by the fact that contestees were seeking to sustain her vote as one for consolidation; and contestants were seeking to have it deducted from the number cast for consolidation. Alta Neill and others intervened in the contest proceeding making common cause with the contestees. In the petition of intervention it was alleged she voted for consolidation. The intervention was, of course, voluntary. The contestees did not join issue upon any of the allegations in the plea of intervention. It seems to us that the reason supporting the rule that allegations of the defendants (who do not come into a suit voluntarily) when following a general denial does not relieve the plaintiff of the burden of proving such fact, does not apply to a petition of intervention, just as it does not apply to allegations of a defendant in a cross-action which is also voluntary. In our opinion, the fact that Alta Neill voted for consolidation should be regarded as concluded by the pleadings as such.

If not, however, the pleadings of which the court was required to take judicial knowledge constituted evidence of the fact, and under the circumstances evidence which we think should be deemed conclusive. We are, therefore, of the opinion that the vote of Alta Neill should have been deducted from the 36 which the court determined had been properly voted for consolidation.

■ With reference to B. L. Stewart who voted for consolidation, the contestants by one assignment of error allege that "The court erred in finding 'that B. L. Stewart was a resident of Elmont School District at the time of the election' * * *", and by another allege that "The court erred in his conclusion of law as follows 'that the vote of B. L. Stewart was properly counted in favor of consolidation of said school districts' ".

No independent question of merit is raised by the latter assignment of error. The conclusion of law alleged to be error was the legal equivalent of a conclusion of law that B. L. Stewart was a qualified voter in the school district. Whether such conclusion of law was right or wrong, depended entirely upon the conclusion of fact that he was a resident of the school district. The honorable trial judge, as the trier of the facts, having concluded as a fact that the voter in question was a resident of the school district—that being the only respect in which his qualification was in issue—there was no error in his said conclusion of law, independently of the error, if any, in the conclusion of fact upon which it was based.

■ The conclusion (finding) of fact that B. L. Stewart was a resident of the school district is the legal equivalent of a conclusion (of fact) that B. L. Stewart, being also found to be a single man, usually slept at night at the home of his son in Elmont School District. R.S. 1925, Art. 2958. Contestants make no contention in this court to the effect that there was no evidence, or that the evidence was insufficient to support a conclusion of fact that Stewart did usually sleep at night at the home of his son. Instead, it is contended that Stewart was shown, conclusively as a matter of law, not to be a resident of the school district "because the uncontroverted evidence shows that the said B. L. Stewart moved from the Elmont School District on March 26, 1940 to an apartment in the town of Van Alstyne which he maintained as a home until July 24, 1940, when he rented another house in the town of Van Alstyne and which he was maintaining as a home on the date of the election and which he still maintained on the date of the trial and the said B. L. Stewart himself testified that when he moved away from his son's home in the Elmont District to Van Alstyne in March,

1940 that he did not intend to go back there to live." It thus appears that if the conclusion that Stewart was a resident of the school district was wrong for the reason contended by contestants, then it was immaterial whether or not he usually slept at night at his son's home in said school district.

Although there is considerable lack of harmony in the decisions in this state, in our opinion, assuming the constitutionality of such a provision—which we do—[1] said Art. 2958, supra, provides a fact test of the requisite residence of an unmarried qualified voter. Does a single person offering to vote and possessing all the other elements of a qualified voter usually sleep at night at a place in the District? If so, he is a qualified voter; otherwise not. We are in agreement with the conclusion upon this point as expressed by Judge King of the Beaumont Court of Civil Appeals, as follows: "The test of a single man's residence within the state, at any given time or during any given period of time, is one purely of fact, and is found in the answer to the question: 'Where does he usually sleep at night?' The proper interpretation of the word 'usually' in this connection is that if the voter, a single man, when he is not actively engaged in his work, has a room or habitation to which he usually returns, and where he usually sleeps at such times, then his right to vote in the precinct where such room or habitation is located is fixed by section 4 of Terrell Election Law, Act of 1905 (Acts 29th Leg. [1st Called Sess.] c. 11 [R.S. 1925, Art. 2958]), even though he should be there only a small per cent. of his time; but, if it should also appear that by reason of the nature of his occupation he was required to adopt a different place as one where he usually sleeps, then his right to vote at the former place is lost and section 22 [now R.S. 1925, Art.

2967] would govern his right to vote." Garvey v. Cain, Tex.Civ.App., 197 S.W. 765, 772. As in principle supporting such view, see, also, Linger v. Balfour, Tex.Civ. App., 149 S.W. 795, 797; Savage v. Umphries, Tex.Civ.App., 118 S.W. 893; Aldridge v. Hamlin, Tex.Civ.App., 184 S.W. 602.

In Huff v. Duffield, Tex.Civ.App., 251 S. W. 298, 299, the court said: "The word 're-sided,' as used in the election law, and through a long line of decisions, it has been held that the intention of the individual often has a strong, if not a paramount, influence in determining residency. Savage v. Umphries (Tex.Civ.App.) 118 S.W. 893; Linger v. Balfour (Tex.Civ.App.) 149 S.W. 795; Aldridge v. Hamlin (Tex.Civ.App.) 184 S.W. 602; Reid v. King (Tex.Civ.App.) 227 S.W. 960.

"We have seen no Texas case denying the test as to whether the person from the place with intent to return or with the intention to abandon it as a residence is a proper test, except the case of Garvey v. Cain (Tex.Civ. App.) 197 S.W. 765 [767], decided in 1917, by the Court of Civil Appeals at Beaumont, which if followed would change the residence of every United States Senator and member of the House of Representatives, the Governor of the State, and heads of departments, disfranchising the former, because they could not vote in the District of Columbia, and forcing the latter to vote in Travis county. No such construction of constitution or statute is warranted by statute or decision * * *."

It is to be observed that in this opinion Judge Fly cited three of the same decisions which had been cited by Judge King in Garvey v. Cain, supra. It is also noteworthy that what was said by Judge Fly upon the facts involved related to the qualifications of a married man. It is believed that as to

---

[1] By an expressly self-executing provision, the Constitution prescribes the qualification of voters, one factor of which is six months' residence in the district or county in which one offers to vote. Art. 6, sec. 2. The Legislature would have no power by definition or test of residence to change the meaning of residence as the word is employed in said constitutional provision. If a court in the exercise of its judicial power should have its jurisdiction invoked to determine whether one or both of the statutory tests of (voting) residence makes that a place of residence which, according to the meaning of residence as employed in the Constitution, would not be such, or made that not the place of residence which, according to the meaning of the word as employed in the Constitution, would be his residence, and it should be made so to appear, there can be no doubt, we think, that it would be the duty of the court to declare the statutory tests, one or both, unconstitutional and void. We do not consider that such a question is presented in this proceeding. Rather, we incline to the view that election officers as delegees of the legislative powers which they exercise are properly to be governed by the statutory tests. Hence we assume without deciding the constitutionality of such tests.

the voter there in question,—one C. H. Pease, a married man not separated from his wife— the decision in Huff v. Duffield was correct; yet, we cannot see that, as applied to a single man, Judge Fly's criticism of Garvey v. Cain was warranted.

Under the Constitution residence is an element of a voter's qualification. (Const. Art. 6, sec. 2). Neither the Constitution, nor statutes purport to give (technically) a definition of residence. Rather, the statute prescribes two tests, one as to a single man, and the other as to a married man not permanently separated from his wife. (Probably as to a married man permanently separated from his wife the test should be construed to be the same as a single man.) These prescribed tests differ materially. The statute says plainly: "The 'residence' of a single man is where he usually sleeps at night." This very language implies the exclusion of intention as an element of the test. The only word properly calling for construction is the word "usually."

The test of the residence of a married man, not permanently separated from his wife, is that his residence is where his wife resides. The assumption is wholly unwarranted, we think, that the language "where his wife resides" necessarily means where his wife usually sleeps at night. Upon this point we are not in agreement with Garvey v. Cain, supra. And by the way, it was this part of the opinion to which the criticism of Judge Fly was applicable; and, as we think, was warranted.

In our opinion, if a husband and wife not permanently separated from each other have a home to which, for example, the constitutional homestead exemption applies, it is the family domicile and permanent place of residence of the husband and wife. Undoubtedly it is the place of the wife's permanent residence.

Domicile and residence are not synonymous. Brown v. Boulden, 18 Tex. 431; Pearson v. West, 97 Tex. 238, 77 S.W. 944; Taylor v. Wilson, 99 Tex. 651, 93 S.W. 109; Pecos & N. T. Ry. Co. v. Thompson, 106 Tex. 456, 167 S.W. 801, 803. Quoting approvingly from a New York case, Flatauer v. Loser, 156 App.Div. 591, 141 N.Y.S. 951, the opinion in the last-cited case says: " 'Residence' means living in a particular locality, but 'domicile' means living in that locality with the intent to make it a fixed and permanent home. Residence simply requires bodily presence as an inhabitant in a given place, while domicile requires bodily presence in that place, and also an intention to make it one's domicile.' " At any time while the wife is actually residing in the family domicile the test of the husband's qualification to vote as respects his residence is easy and certain of application. It is the place of his and his wife's domicile.

The husband or wife, or both, while retaining their domicile may actually reside elsewhere temporarily. May a temporary residence of the wife at a particular place, she having a domicile elsewhere in this state, be the place where she resides within the meaning of the test? Under the authorities this question is no less difficult than important. It is believed that the language of the statute considered alone is susceptible to either of two constructions, namely, (1) that the place where the wife resides is her permanent place of residence, her domicile or home; or (2) is any other place where she temporarily resides. The first question which suggests itself is, if the latter be the meaning of the statute, why did the Legislature make the temporary residence of the wife, rather than the temporary residence of the husband, the test of the latter's qualification as a voter? Under such construction the test would appear to be unnecessarily complicated without any compensating useful purpose to be subserved. Again, if a temporary residence of the wife controls the husband's qualifications as a voter, then undoubtedly it is true, as said by Judge Fly in Huff v. Duffield, supra, it "would change the residence of every United States Senator and member of the House of Representatives, the Governor of the State and heads of departments, disfranchising the former, because they could not vote in the District of Columbia, and forcing the latter to vote in Travis county" subject only to the qualification that any such be a married man not separated from his wife, and who is temporarily residing with him in Washington or Austin. These and other considerations seem to us to warrant the adoption of the first mentioned of the two possible constructions and the rejection of the latter.

Under such construction it is plain that questions may frequently arise as to whether the wife's residence at a particular time and in a particular place is permanent or only temporary. Included in such question will be the question of intention, the same as arises in controversies regarding homestead exemptions. What we have said regarding the test of a married man's voting

residence is, of course, of the nature of dicta, since the question for decision here has reference to a single man. However, in view of conflicting decisions it has been deemed necessary to discuss both tests in order to show the true operation of the one involved and properly to appraise decisions which apparently have not been based upon recognition of any material difference between the two.

For the same reason it seems advisable to consider the proviso of the statute reading, "Provided that the residence of one who is an inmate or officer of a public asylum or eleemosynary institute, or who is employed as a clerk in one of the departments of the government at the capitol of this State, or who is a student of a college or university, unless such officer, clerk, inmate or student has become a bona fide resident citizen in the county where he is employed, or is such student, shall be construed to be where his *home* was before he became such inmate or officer in such eleemosynary institution, or asylum, or was employed as such clerk or became such student; and if on payment of his poll tax he would be a qualified voter he shall be permitted to return during the month of January in each year to his *home* to pay his poll tax or obtain his certificate of exemption, and shall be permitted to return again to his *home* to vote at any general or primary election." (Italics ours). Art. 2958, supra. The subject of this provision is quite plainly exceptions to one or the other, or both, of said tests of residence. In terms, it may apply to both; but actually it is limited in practical effect to single persons. If we have properly construed the test relating to the residence of a married man, it could not operate to affect, as an exception or otherwise, the test determining the voting residence of a married man; for regardless of the exceptions a married man's voting residence would be his home. Therefore, we think the exceptions must relate only to the test of a single man's residence; namely, "where he usually sleeps at night."

Under familiar principles of construction the proviso shows clearly the legislative intention that the place where a single man usually sleeps at night determines his residence as a voter, whether such place be his home or not, and, therefore, whether he has any other home or not. Unless that be true, then no practical meaning or effect can, so far as we can see, be given to the exceptions.

It is not deemed incumbent upon us under the record here presented to anticipate and discuss possible arguments that may be made against such construction of the test of a single man's residence as an element of his qualifications to vote. It may be admitted that in applications of such a test some undesirable results may appear. If so, that would raise only a question as to the wisdom of the law, but the statute being clear in the intention expressed, the undesirable results would not raise a question of construction.

■■■ W. H. Nixon and wife voted for consolidation and the qualifications of each to vote are challenged on the ground that they were not residents of Elmont School District. The findings of the honorable trial judge show that said Nixon and wife had had a home in the District in which they actually resided until early in the year 1940 when they sold their home and moved to Van Alstyne outside said district, where they occupied rented premises continuously up to the time of the trial. "That the said W. H. Nixon did not desire to move out of said Elmont School District and forthwith on the sale of his farm began seeking another place of abode in said school district intending to return to said district as soon as he could secure another place of abode in said district. That some weeks prior to the election, the said Nixon did negotiate a trade with a tenant renting a tract of land in the Elmont District whereby Nixon proposed to take over the lease on the place for 1940 and to move onto the place as soon as consent of the landlord owner could be obtained to his purchase of the year's lease from the tenant. That at the time of the election in question Nixon had completed his trade with the tenant and was still negotiating for the consent of the landlord owner at the time of the trial of this cause."

In our opinion, said findings do not support the conclusion that "for voting purposes they were residents of said district at the time they voted in said election." On the contrary, said findings show conclusively, we think, as a matter of law, that the former home had been abandoned. Nixon and wife had moved out of the district, which is to say, they had acquired a residence, whether permanent or temporary,— it matters not—outside the Elmont District. At the time of the election they were not residing in the school district permanently or temporarily. At most, there was an inten-

tion to become residents of the district and even that subject to contingencies. At the time of the election there was no lot or tract of land in the school district to which the homestead exemption could attach in their favor. A homestead cannot be acquired by intention alone. It is just as certainly true, we think, that a permanent place of residence cannot be acquired by intention alone, since after all, a home is a permanent place of residence.

■ The situation is not at all analogous to that which would have been presented had the Nixons not sold their home, but had moved, as they did, to Van Alstyne and occupied rented premises, as they did. In that case, intention or not to abandon the home—permanent place of residence—would have been material. Selling a home and moving from it is an abandonment, as a matter of law. Intention alone to acquire another is, in advance of any character of actual residence, use or preparation, wholly immaterial and ineffective. Farmers' Nat. Bank v. Coffman, Tex.Civ.App., 79 S.W.2d 905, and authorities there cited. It is therefore, our conclusion that the votes of Mr. and Mrs. W. H. Nixon should have been deducted from the total number of votes returned and canvassed as voting for consolidation.

■ Mrs. Dick Coffee, a widow, of an age required to pay a poll tax as a part of her qualifications to vote, cast her vote for consolidation. Such vote is challenged on the ground that she resided in Farmington election precinct and not in the Elmont School District. It seems to have been treated as an undisputed fact that no part of either district was included in the other. Mrs. Coffee's poll tax receipt listed her as a resident of Farmington precinct and she customarily voted in that precinct. She had lived at the same place for many years and had never before voted in the Elmont School District. Her vote was sustained upon the findings that she actually resided within the boundaries of the Elmont District. This question is posed: When one, subject to the payment of a poll tax as an element of his qualifications to vote, presents his poll tax receipt showing his residence to be in another precinct than the one in which he offers to vote, may the election officers determine that the statement of the voter's residence as made in the poll tax receipt is the result of mistake and be authorized to find as a fact the voter's residence to be in the precinct in which he offers to vote and thereupon be authorized to accept and count such vote? This is a novel and difficult question to which we find no conclusive answer in any of the decisions.

The Constitution requires not merely the payment of a poll tax when due as one condition of the voter's qualification, but also that he hold a receipt showing that said poll tax was paid before the first day of February next preceding such election. Art. 6, sec. 2. Section 4 empowers the Legislature to make "regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot box." Id. Art. 6, sec. 4. It is undoubtedly referable to this power that the Legislature has provided, among other things, that poll tax receipts shall show the voting precinct in which the poll taxpayer resides. R.S.1925, Art. 2965, Vernon's Ann.Civ.St. art. 2965. Statutory provision is also made for the tax collector, if necessary, to hear proof of the taxpayer's residence in order to enable him properly to issue a poll tax receipt showing the taxpayer's place of residence. Id. Art. 2973. This information is required to be furnished by the taxpayer or his authorized agent. Id. Art. 2961. Evidently for the purpose of aiding the tax collector to check such information and make the records speak the truth, the Commissioners' Court whenever it makes changes in election precincts is required to furnish a certified copy thereof to the tax collector. Id. Art. 2933. Such is a part of the data deemed necessary to enable the tax collector to perform the further enjoined duty to furnish election officers with lists of poll taxpaying voters, etc., in each precinct. Id. Art. 2975, Vernon's Ann.Civ.St. Art. 2975. Provision is made prescribing polltaxpayers' rights and powers, who, after the payment of poll taxes in one district, move to another or to another county. Id. Art. 2967.

Only political powers, rights and duties are involved. The same is true of an election contest in court when the proposition voted upon does not involve candidates for office, or a right to office. DeShazo v. Webb, 131 Tex. 108, 113 S.W.2d 519. These considerations lead us to the conclusion that since the law imposes the duty upon a citizen in person or by agent to furnish to the tax collector information as to the precinct of his residence and makes provision for the passing on of such information by the tax collector to the election officers for their guidance, to the end of preventing fraud and preserving the purity of the ballot box, if a citizen discovers an error in his poll tax

receipt he should take steps to have it corrected by the issuing authority before offering to vote in another district without change of residence. It follows that in our opinion the vote of Mrs. Coffee should have been deducted from the total number cast for consolidation.

The correctness of the contestants' last proposition is believed to be dependent upon whether the finding of the trial judge should be sustained to the effect that 72 ballots were cast, 38 for consolidation and 34 against; that the ballots were numbered consecutively, except there were two ballots numbered 3 and no ballot numbered 30, and two ballots numbered 15 and no ballot numbered 14; that the status of the two ballots numbered 3 was that one was properly numbered 3 and the other should have been numbered 30, and as to the two ballots numbered 15, that one should have been numbered 14 and the other 15. We sustain this finding, and, therefore, overrule the assignment and proposition based upon same.

The result of our conclusion upon the whole is that the election contest should have been sustained and the result of said election declared to be that a majority of the votes were cast against consolidation; or, at any rate, that a majority of the votes were not for consolidation, and, therefore, the proposition had failed to carry.

It follows that, in our opinion, the judgment of the court below should be reversed and here rendered to the effect that said proposition to consolidate said districts had failed. It is so ordered.