418 S.W.2d 276 (1967)
J. B. WALKER, Jr., et al., Appellants,
v.
W. W. THETFORD et al., Appellees.
No. 11480.
Court of Civil Appeals of Texas, Austin.
June 21, 1967.
Rehearing Denied September 13, 1967.
*278 Dell Barber, Frank Ginzel, Perry O. Barber, Sr., Colorado City, for appellants.
*279 Frank Dickey, Sr., County Atty., Robert Lee, Blanks, Thigpin, Logan, Steib & Lewis, Curt F. Steib, Glenn W. Lewis, San Angelo, for appellees.
O'QUINN, Justice.
This lawsuit contests an election called on the proposition of consolidating two school districts in Coke County. Both the canvass of the returns of election and a later recount of the ballots in district court showed the election carried by a majority of two votes, although each finding was based on different totals.
Petitions were presented to the County Judge of Coke County January 27 and January 31, 1966, seeking elections in each of two school districts on consolidation of Robert Lee Independent School District and Silver Peak Common School District (Coke County District No. 28). The county judge on February 1 called the two elections for February 26, 1966. This case involves the results of the election held in Silver Peak.
Between the time the county judge called the election and the date the election was held several events, unrelated to the facts of this case, but of significance in declaring the law of the case, occurred in the courts and in the legislature.
A three-judge federal district court, sitting at Austin, in an opinion handed down February 9, 1966, held unconstitutional the requirement of payment of a poll tax in this state as a precondition to voting. United States of America v. State of Texas et al., 252 F.Supp. 234, affirmed 384 U.S. 155, 86 S.Ct. 1383, 16 L.Ed.2d 434. The district court granted a stay of the injunctive features of its decree until February 23.
The Governor called a special session of the legislature, convened February 14, for the purpose of enacting a voter registration law. S.B. No. 1 was enacted by the legislature and the Governor signed the bill into law February 24, 1966, two days before the Silver Peak election.
S.B. No. 1 provided that for the current voting year holders of poll tax receipts would not be required to reregister, and provided a 15-day supplemental registration period, beginning seven days after effective date of the law. This period began March 3 and ended March 18.
A justice of the Supreme Court of the United States, on February 23, denied a stay of execution of the judgment in the case decided February 9, but the district court granted an extension of its stay on February 26, the day of the election. The stay was made effective until March 26, 1966.
At the Silver Peak election two ballot boxes were used for the voters, who were divided into two groups: (1) persons having paid a poll tax or having a right of exemption and (2) persons without poll tax receipts or exemptions, but otherwise qualified voters, who presented themselves at the polls to vote.
The Commissioners' Court of Coke County canvassed the Silver Peak returns February 28 and declared the results showing that in the first group 65 voted for and 62 against consolidation, and in the second group the vote was 11 for consolidation and 12 against. The net result declared was that the voters in Silver Peak approved consolidation by a vote of 76 to 74.
Suit was brought in district court contesting the election and attacking its validity on a number of grounds. The trial judge in open court caused the ballots of all voters to be re-counted. After declaring certain ballots illegal for various irregularities, the court found that the election carried by a majority or two votes, there being 73 votes for consolidation and 71 against. In group 1 the vote was 63 to 61 for consolidation, and in group 2 the vote was 10 to 10.
Contestants have perfected their appeal from the judgment of the district court, entered June 9, 1966. The appeal presents the question of residence and the right to vote *280 at the election of three married couples and contests validity of the election for reasons related to the holding of the federal court and subsequent enactment of the registration act by the legislature. Appellees by counter-point present a jurisdictional question based on claim of non-compliance with statutory requirements of notice of the election contest, a point the trial court overruled.
The trial court upon request made and filed findings of fact and conclusions of law. Appellants assign twenty points of error.
We will consider all points of error under three designated headings and in this order: (1) jurisdictional point asserted by appellees, (2) appellants' challenge of the eligibility of six voters, and (3) error assigned by appellants asserting invalidity of the election held after the decision of the federal district court and prior to the close of the 15-day supplemental registration period.
Appellees pleaded that the contestants failed to comply with the provisions of Article 9.03, V.A.T.S. Election Code, prescribing the time and manner of giving notice of intention to contest an election. The trial court overruled the plea to the jurisdiction and appellees have preserved the asserted error.
Article 9.03 requires notice in writing, within 30 days after canvass of the election returns, stating intention to contest an election and the grounds relied upon to make the contest. It is well-settled that the written notice is mandatory and, being jurisdictional, may not be waived. 21 Tex. Jur.2d, Elections, secs. 165-168, pp. 427-434, and cases cited.
Following canvass of the Silver Peak returns February 28, the contestants on March 26, acting through their attorney, delivered a signed copy of the original petition of contest filed in this cause to the county attorney. Noted in writing on the petition handed the county attorney appeared the following paragraph, also signed by attorney for the contestants:
"A copy of this petition has this the 26th day of March, 1966, been delivered to Frank C. Dickey, Sr., County Attorney of Coke County, Texas, notifying him that this election is being contested and the grounds upon which such contest is based. /s/ Dell Barber."
It appears that at the time Barber delivered the petition to Dickey, the county attorney at Barber's request called a deputy district clerk to open the clerk's office so Barber could file the original of the petition in court. Mildred A. Wallace, a deputy clerk, opened the office, and "some thirty minutes or an hour" after signed copy of the petition had been handed Dickey the original was filed with the district clerk. It does not appear whether the county attorney actually witnessed the filing, but he did arrange for it by calling the deputy clerk.
Contestants named as defendants in the petition the county judge, the four members of the commissioners' court, and the county attorney. Citation was not issued and none was served on any of the defendants.
On April 5, 1966, following filing of the petition on March 26, the county attorney, joined by other counsel, filed in behalf of all defendants a plea to the jurisdiction, special exceptions to the original petition, and an original answer, indicating on each that copies had been served by mail on Dell Barber, attorney for contestants, on April 4. The trial court on April 7 set the jurisdiction plea for hearing on May 4, at which time the court overruled the plea, and the case went to trial May 25, 1966.
Under Article 9.31, V.A.T.S., Election Code, the county attorney was properly made a contestee of the election and was the proper person to be served with the notice and statement required under Article 9.03. Jordan v. Overstreet, Tex.Civ.App., Beaumont, 352 S.W.2d 296 (no writ). Article *281 9.31 also provides that the county attorney "shall file his reply thereto as in the case of a contest for office." (Acts 1951, 52nd Leg., ch. 492, p. 1097, art. 159).
Appellees rely upon the holding in Barker v. Wilson, Tex.Civ.App., Austin (1918), 205 S.W. 543 (no writ) in urging that the trial court was without jurisdiction to hear the suit. In that case the attorney for contestants, within less than thirty days after the return day of the election, delivered to the county attorney the original petition in the suit which at that time had not been filed. The county attorney read the petition and next day, or soon thereafter, returned it to attorney for contestants at the attorney's express request, who explained that he was going to mail the petition to the district judge. The county attorney at the same time signed a written waiver of issuance and service of process. Suit was not actually filed "until long after the expiration of 30 days from the return day." The waiver by the county attorney was filed with the petition.
At the trial of Barker v. Wilson, both the county attorney and attorney for contestants testified that the attorney had informed the county attorney orally it was his intention to contest the election and would file the petition for that purpose. No other proof of notice of intention to contest the election was made in the suit.
In Barker v. Wilson the court held that the requirements of the statute as to notice of intention had not been met. The court said, "It may be conceded that delivery to [the county attorney] of the petition, setting forth the ground upon which it was claimed the election was illegal, constituted compliance with one portion of the statute; but it contained no notice notifying the contestee that it was the intention of the contestants to file that petition in court and use it as a basis of a contest." 205 S.W. 543, 546, col. 2. The court held that to comply with the statute the notice must be in writing and state two separate and distinct facts: (1) the contestants' intention to contest the election and (2) the ground relied upon to sustain the contest.
The court decided that the "verbal notice, though it may be just as satisfactory to the contestee, is not such compliance with the statute as confers power upon the court to hear and determine the contest."
"This statute is mandatory," the court declared, "and, unless complied with within the time stated, the court has no jurisdiction to entertain the contest." The court distinguished the facts of Barker v. Wilson from the facts in Messer v. Cross, Tex. Civ.App., Galveston (1901), 63 S.W. 169 (no writ) and decided there was no conflict between the two cases. In Messer v. Cross the contestants filed a written petition and had all defendants served within thirty days after return day of the election. The Galveston court concluded that service of the citation, with copy of the petition attached, gave to the contestees all the notice of contestants' "intention to contest the election, and of the grounds of such contest, to which they were entitled under the law, or which possibly could have been given them." 63 S.W. 169, 171, col. 2.
In the cause now before this Court the county attorney was informed in writing, before the expiration of thirty days following the canvass, that contestants intended to contest the election on the grounds set out in the written petition on which the notice appeared. This was similar to the method of notice followed in Messer v. Cross, except in that case the petition was filed before being delivered to the county attorney. In the case at bar the petition was filed immediately after the written notice was delivered and before the expiration of thirty days after the return day.
While the county attorney had no authority, as was attempted in Barker v. Wilson, to waive any requirement of the statute as to written notice of intention to contest and of the grounds for the contest, Moore v. Commissioners' Court of Titus *282 County, Tex.Civ.App., Texarkana (1917), 192 S.W. 805 (no writ), it became his duty, upon being served with sufficient written notice, to file a reply, which he properly did within ten days after notice was delivered to him. (Article 9.31, V.A.T.S., Election Code).
We conclude that the written notice to the county attorney met the requirements of the statute and that the district court acquired jurisdiction to hear and decide the contest.
Appellants' twenty points of error fall generally into presentations of two aspects of this case. The first pertains to qualifications of six persons to vote at the election. The second, which we will consider later, relates to an attack on validity of the election under the contention no lawful election could be held until after the supplemental registration period ending March 18, 1966.
The questions concerning voter qualification stem from appellants' contention that Mr. and Mrs. C. F. Patterson, Mr. and Mrs. Wayne S. Reed, and Mr. and Mrs. Wayne Drennan were not residents of a voting precinct within the boundaries of Silver Peak School District, and therefore did not have a right to vote at the election February 26, 1966. The facts concerning the residence of the Pattersons and the Reeds are similar and will be discussed separately from the facts related to residence of the Drennans.
The Pattersons and the Reeds lived in the Silver community, where the men worked for the Sun Oil Company. They lived in houses owned by the oil company, for which they paid rent, in an area referred to as the Sun company camp. Sometime after the middle of 1965 the oil company advised the employees and tenants, including the Pattersons and Reeds, that the camp would be abandoned and the houses sold off. With this prospect in view, the Pattersons and Reeds began making arrangements to move.
The Pattersons had moved to Silver in 1958, the Reeds in 1951, and both couples had lived and voted in the Silver box during the years since moving to Silver. The Pattersons bought a lot in Robert Lee in November, 1965, in anticipation of moving to Robert Lee. They bought a house from the Sun Oil Company and moved it to the lot February 27, 1966. The Reeds bought a lot in Robert Lee, with intention of moving, on February 24, 1966, two days before the Silver Peak election. The Reeds bought a house from the oil company and had it placed on their lot April 12, 1966. Neither the Pattersons nor the Reeds moved to Robert Lee until after the election. The Pattersons moved from Silver to Robert Lee April 2, 1966, but paid rent at Silver until the latter part of April. The Reeds moved in May, about two weeks before the trial, which began May 25, 1966.
The Silver box was designated No. 8 and Robert Lee designated No. 1 for voting and issuance of poll tax receipts. Silver box No. 8 was within the Silver Peak School District, but Robert Lee, box No. 1, was not a part of the Silver Peak School District.
Patterson obtained poll tax receipts for himself and his wife January 27, 1966, and upon informing the tax office personnel of his prospective move to Robert Lee, the receipts were issued to show residence at Robert Lee (No. 1) and not at Silver (No. 8) where they were living at the time. The Pattersons were still living at Silver, and Patterson was working there, on the day of the election when both of them voted.
Patterson's testimony relating to issuance of the two receipts was as follows:
"Q Now, did you procure your poll tax to vote for 1966?
A Yes, sir.
Q And did you state to the person that issued the poll tax that you resided in Robert Lee?
A No, sir.

*283 Q What did you tell them?
A Told them I was living in Silver.
Q What else did you tell the person? Do you recall to whom it was you were talking?
A A Mrs. Burns and Mr. Jacobs both were there. The office was full and they could all hear.
Q And you told themwhat did you tell them?
A I told them I was moving to Robert Lee."
About a week or ten days before the school election, Patterson took his and his wife's receipts to O. B. Jacobs, county tax collector, and asked that the receipts be changed. His testimony concerning this matter was given as follows:
"Q Now then, did you ever bring your poll tax back and get this receipt right thereyou see there on the poll tax it says `Address, Street and House No.,' and it just says `Robert Lee, Texas?'
A Right.
Q But it puts you in the voting precinct of No. 1 up here?
A Yes, sir.
Q Who changed it?
A Well, Mr. Jacobs changed his stub.
Q Well, do you have your poll tax?
A I do.
Q Do you have it with you?
A Yes, sir.
Q May we see it?
A (Handed to counsel.)
Q Now then, I notice here over `1' there is an `8' traced, is that correct?
A So far as I know, it is. I just handed them my poll tax and asked them to change it.
Q When did you do that?
A That was about a week or ten days before I voted.
Q And did you have him change your address, your street address, and so forth?
A No.
Q You still have that as Robert Lee, Texas?
A Yes. I still have an address in Silver, but it's just the post office.
Q I see. Now, this change here, was that made onsee if it is made on the copy that has been introduced.
A No, sir.
Q It is just traced on that
A But at the time it was, he told his assistant in there to change it on everything that was supposed to be changed.
Q Did your wife have hers changed too?
A Yes, sir.
Q Did you bring it down or did she bring it down?
A I brought it down.
Q And you had it changed
A Just like that.
Q Just like that; and you say that Mr. Jacobs did that changing there?
A Yes."
Reed obtained poll tax receipts for himself and his wife under circumstances similar to the Patterson experience. The facts *284 in this regard related by Reed are found in the following:
"Q Did you obtain that poll tax receipt yourself or did your wife obtain it?
A I obtained it myself.
Q From whom did you get it, do you recall?
A Mr. O. L. Lisby, Silver.
* * * * * *
Q Mr. Reed, did you say you talked to the Tax Collector Deputy when you got your tax receipt?
A Yes, sir.
Q And did you tell him that you lived here in Robert Lee?
A No, sir.
Q What did you tell him?
A I lived in Silver.
Q You told him you lived in Silver, and did you tell him you were fixing to move down here?
A I planned to move here.
Q That is what you told him?
A Yes, sir.
Q That you planned to move here?
A Yes, sir.
Q At that time had you already been notified that the Sun Oil Company was going to close the camp up there at Silver?
A Yes, sir.
Q And you were living in one of the Sun Oil Company houses?
A Yes, sir.
Q So at the time you got your poll tax how come you to have it issued like it was? Just tell us.
A Because I planned to move here.
Q You were planning to move here. And you did move here?
A Yes, sir."
Reed made no effort to get the two receipts he had obtained changed in any way prior to the election.
The tax collector testified that he knew of the prospective moving of the people from Silver and closing of the camp there, and that the listing of the Robert Lee precinct on the poll tax receipts for the Pattersons and Reeds was made with this prospect in mind. He testified that he did not know about the school consolidation election when the receipts were issued and "overlooked the trustee election," usually held in April. He had in mind only the primary elections of May and June, and anticipated the moves would be completed by that time. He said he thought writing the receipts showing the prospective residences in Robert Lee "would just save trouble."
On this point the tax collector, in giving his evidence about the issuance of poll tax receipts to the Pattersons, testified that "they said they would be here [Robert Lee] by the time of the May primary * * and just might as well go ahead and put them in Precinct No. 1." When asked, "And your Deputy put them in Precinct No. 1 and gave their address as Robert Lee?," the tax collector replied in the affirmative.
The tax collector did not recall changing the Patterson receipts, but upon inspecting them was able to say the changes were in keeping with his methods. His testimony on this subject was in part as follows:
"Q Mr. Jacobs, do you recall ever changing the voting precinct of Mr. Patterson, Beatrice Patterson or C. F. Patterson?
A May I look at it?

*285 Q Yes, sir (handing to witness).
A Yes, sir, I believe I changed them. I don't actually recall it but
Q You didn't change the address there, did you?
A No, sir.
Q You just changed the `8' up there?
A Yes, sir.
Q Well, do you recall doing it?
A No, sir, I don't.
Q You don't recall it?
A No, sir, but that's the way I change them.
Q That's the way you change them?
A So I feel sure that I did.
Q But you don't recall it?
A No, sir.
Q Did you change it on any of the receipts in your book?
A No.
Q In either one of your books?
A No, sir.
Q Do you know you didn't?
A No, sir. I checked it.
Q You have checked to see and you know you didn't?
A Yes.
Q And you don't recall changing this, `1' into `8'?
A No, sir, I don't recall it, but I am sure that I did it.
Q Well, you say you are sure you did it. What makes you sure you did it?
A Because I change them and I can tell that's exactly the way I do it."
The trial court found that the Pattersons and the Reeds were residents of Silver, precinct No. 8, when they obtained their poll tax receipts and were residents of that precinct when they voted in the Silver Peak election. The court also found that when the poll tax receipts were issued to the Pattersons and the Reeds, and when the poll lists were prepared, the residence of these four voters was by the tax collector incorrectly listed as the Robert Lee voting district. The court found that these errors were occasioned by the mistaken understanding of the tax collector that at some future time, prior to any election, the Pattersons and Reeds would move to Robert Lee; that issuing the tax receipts and making the lists, each with errors as to residence, were acts performed solely by the tax collector and not at the request or upon the insistence of the Pattersons or the Reeds; and that the tax collector acted in good faith and not in a fraudulent manner nor with fraudulent intent.
It is a well-settled rule in this state that in a case tried before the court without a jury, in which the trial court files findings of fact and conclusions of law, the court of civil appeals will indulge every reasonable presumption, unless the record shows to the contrary, in favor of the findings and judgment of the trial court, and no presumption will be indulged against validity of the judgment. Collins v. Tucker, Tex.Civ.App., Fort Worth, 333 S.W.2d 218, 219 (no writ); 4 Tex.Jur.2d, Appeal and Error-Civil, sec. 806, pp. 329 et seq., and authorities cited.
The question of residence of voters has been involved in numerous election contests in this state. The Supreme Court in 1954 held that a voter is required to vote in the election precinct in which he resides if the vote is to be counted. Harrison v. Jay, 153 Tex. 460, 271 S.W.2d 388, construing Article 2.06, V.A.T.S. Election Code. See also Teeple v. Beedy, Tex.Civ. App., Amarillo, 316 S.W.2d 311 (no writ).
*286 The Pattersons in 1958 and the Reeds seven years earlier, in 1951, took up residence at Silver, in election precinct No. 8. The men worked in Silver, and the two couples lived and voted there until they moved to Robert Lee, in April and May, 1966. The Pattersons for more than seven years and the Reeds for fourteen years maintained continued residence at Silver. Neither couple had ever lived or voted in Robert Lee. Under such circumstances, Silver continued to be the residence of the Pattersons and the Reeds until they actually moved, with intention to abandon residence at Silver and to take up residence at Robert Lee. Owens v. Stovall, Tex.Civ. App., Waco, 64 S.W.2d 360 (writ ref.).
The Pattersons and the Reeds bought lots at Robert Lee prior to the Silver Peak election in which they voted. The Pattersons bought a house from Sun Oil Company before the election and had it placed on their lot at Robert Lee the day after the election. The Reeds bought a house from the oil company and had it placed on their lot at Robert Lee about six weeks after the election. Both Patterson and Reed told the tax office personnel in January when they bought poll taxes that they and their wives intended to move to Robert Lee later on. The moves to Robert Lee from Silver actually took place some five weeks after the election for the Pattersons and for the Reeds about ten weeks after the election.
Robert Lee did not become the legal residence of the Pattersons until they moved into their home at Robert Lee in April, 1966. The Reeds did not become legal residents of Robert Lee until they moved into their home there in May, about two weeks before the trial started May 25, 1966. Farrell v. Jordan, Tex.Civ.App., Houston, 338 S.W.2d 269 (writ dismd.).
In Farrell v. Jordan a couple named Lewis, who had lived in Houston twenty years, started preparations to move to Alvin, in Brazoria County, as early as July, 1959, when Lewis contracted for construction of a home in Alvin on a lot they owned. They made utility deposits in Alvin in November, 1959, but the house was not completed until shortly before they moved into it April 4, 1960. They had been in Alvin on occasions before moving to see after the construction and had spent a few nights in Alvin on such occasions. They paid their poll taxes in Brazoria County in January, 1960, and started getting some of their mail at Alvin in January and February. The court held that with all of their intentions and preparations to move to Alvin, beginning in July, 1959, legal residence was not actually accomplished until they physically occupied their home and started living in it at Alvin early in April, 1960. The court held, "Alvin became their residence only when they moved to Alvin and commenced living there with the intention to make it their home." 338 S.W.2d 269, 275, col. 2.
The rule of residence found in Owens v. Stovall, supra, and Farrell v. Jordan, supra, was applied by the courts in Prince v. Inman, Tex.Civ.App., Beaumont, 280 S. W.2d 779 (no writ), involving residence of a school trustee, and in Texas and N. O. Railroad Co. v. Tankersley, Tex.Civ.App., San Antonio, 246 S.W.2d 253 (no writ), in determining residence under the venue statutes.
In applying the rule in an election contest, the court held in Major v. Loy, Tex. Civ.App., Eastland, 155 S.W.2d 617 (no writ), that "Selling a home and moving from it is an abandonment, as a matter of law. Intention alone to acquire another is, in advance of any character of actual residence, use or preparation, wholly immaterial and ineffective." 155 S.W.2d 617, 623, col. 1. In Tondre v. Hensley, Tex. Civ.App., San Antonio, 223 S.W.2d 671 (no writ), in the contest of an election to consolidate two school districts, the court held that one Townsend who testified he intended to move to his farm located in the school district, but for a number of years had lived with his family at a residence outside the district, was not a resident of the district, since the evidence showed "that he had not yet carried that intention *287 into effect." 223 S.W.2d 671, 673, col. 2.
Appellants contend that the votes cast by the Pattersons and the Reeds were illegal and should not have been counted because their poll tax receipts showed them to be residents of Robert Lee, in precinct No. 1, instead of Silver, in precinct No. 8, and for the further reason that they did not present their receipts at the polls, and were permitted to vote without making affidavits respecting their true residence in accordance with provisions of Article 5.14, V.A.T.S. Election Code.
The trial court found that the Pattersons and Reeds, on election day when they voted, had resided in the school district a number of years and had not changed their residences; that these facts were known to the election officials, and furnishing an affidavit as to their residence would not have added anything to what the election officials themselves knew. The trial court also found that the lack of affidavits was not an omission of the Pattersons and the Reeds in failing to furnish them, but was an omission of the election officials in failing to require the voters to furnish the affidavits.
The rule has prevailed many years in this state that the irregularity or mistake of the tax collector, even if in good faith participated in by the voter, when the poll tax receipt is issued, will not deprive the voter of his constitutional right of suffrage. Wallis v. Williams (1908), 50 Tev.Civ.App. 623, 110 S.W. 785 (no writ).
In Wallis v. Williams the poll tax receipt questioned had not been purchased on the written order of the voter, but on the voter's oral request. The statute required that purchase be made in person or on written order. The court pointed out that the right of suffrage conferred by the Constitution requires only that the voter pay the tax before February 1 and that he hold his receipt evidencing payment. The statute on the subject, the court said, "* * * directs that the voter shall pay the tax in person, or give a written order therefor; but it does not provide that a failure to obtain his receipt in the manner directed by the statute will disfranchise the voter." 110 S.W. 785, 786, col. 2.
In accord with the rule in Wallis v. Williams, supra, are Robinson v. Bostrom, Tex.Civ.App., San Antonio, 21 S.W.2d 580 (no writ) and Warren v. Robinson, Tex. Civ.App., San Antonio, 32 S.W.2d 871 (no writ).
In Reynolds v. Cobb, Tex.Civ.App., Dallas, 196 S.W.2d 60 (no writ) poll tax receipts were questioned because of the manner of appointment of deputy tax collectors and for the reason that the receipts were issued at places other than the collector's office or places previously designated by the collector for collection of taxes. The court held the receipts valid, adopting the reasoning in Wallis v. Williams, supra, and citing Warren v. Robinson, supra.
Designation on the poll tax receipt of the wrong precinct by the tax collector was involved in Vicars v. Stokely, Tex.Civ.App., San Antonio, 296 S.W.2d 599 (writ ref., n. r. e., 157 Tex. 182, 300 S.W.2d 623). Several voters who lived in precinct 12 had poll tax receipts showing they lived in precinct 16. It appears the tax collector "had experienced difficulty in ascertaining the true precinct boundaries," and the court found that the mistake on the poll tax receipts "was occasioned by an innocent mistake and confusion about the boundary lines." Other authorities cited on this point in Vicars v. Stokely were Tondre v. Hensley, Tex.Civ.App., San Antonio, 223 S.W.2d 671 (no writ) and Graham v. Villareal, Tex.Civ.App., San Antonio, 242 S.W.2d 258 (no writ).
American Jurisprudence states the general rule that "a vote is not rendered invalid by an irregularity in registration due to the act or default of registration officers." 25 Am.Jur.2d, Elections, sec. 102, pp. 790, 791, and sec. 111, p. 797.
*288 The Supreme Court, in Thomas v. Groebl, 147 Tex. 70, 212 S.W.2d 625, applied the "well established rule of construction that statutes regulating the right to vote should be given a liberal interpretation in favor of that right." With specific reference to statutes regulating registration, the Court employed this language:
"This rule of construction, to avoid depriving individuals of their franchises, applies as well to registration laws as to other laws regulating voting." Citing Sutherland's Statutory Construction, 3d Ed., Vol. 3, sec. 5820, p. 115, 212 S.W.2d 625, 630, col. 2.
The Pattersons and the Reeds met the requirements of the law when they furnished the tax collector the information required of them for issuance of correct poll tax receipts. It was the duty of the tax collector to issue poll tax receipts placing them in the precinct of their residence. The mistake of the tax collector may not be charged to the voters with the force that it disfranchises them.
Under the provisions of Article 5.14, V.A.T.S. Election Code, as amended in 1963, a poll tax receipt containing an error, such as showing the wrong precinct, may be corrected by the tax collector on application of the voter upon a showing that the mistake was that of the tax collector or came about through innocent mistake of the holder in furnishing information when the receipt was issued. Acts 1963, 58th Leg., ch. 424, sec. 26, p. 1017. The statute further provides that if the error is in the voting precinct the voter's name must be placed on a supplemental list for use at the elections in the precinct of his residence.
The Pattersons, in an effort to correct the error of their receipts, took the proper steps to obtain correction a week or ten days before the election. Again, through no fault of theirs, the tax collector did not comply with the law and change the duplicate receipts in his office. The collector also failed to amend the poll tax list for Silver, precinct No. 8, to include the names of the Pattersons. The same rules of law that prevent disfranchisement of the Pattersons for having obtained receipts containing errors will shield them from being disfranchised if the tax collector failed to place their names on an amended or supplemental list of qualified voters.
Since the Reeds made no effort to have their poll tax receipts corrected prior to the election, we must decide whether they were disfranchised.
We have concluded that the holding in Major v. Loy and the holdings in other cases that followed the rule announced in that case do not debar a holding that the Reeds were not disfranchised by their failure to obtain corrected receipts.
In Major v. Loy the vote of a Mrs. Coffee, in an election on consolidation of two school districts, was challenged on the ground that she resided in Farmington election precinct and not in Elmont School District. No part of either district was included in the other. The voter's poll tax receipt listed her as a resident of Farmington precinct, where she customarily voted. She had lived in the same place many years and had never before voted in the Elmont School District. In the trial court her vote was sustained on a finding that she actually resided within the Elmont School District. The court of civil appeals, Justice Funderburk writing the opinion, held the vote illegal.
The question before the court was stated as follows:
"When one, subject to the payment of a poll tax as an element of his qualifications to vote, presents his poll tax receipt showing his residence to be in another precinct than the one in which he offers to vote, may the election officers determine that the statement of the voter's residence as made in the poll tax receipt is the result of mistake and be authorized to find as a fact the voter's residence to *289 be in the precinct in which he offers to vote and thereupon be authorized to accept and count such vote?" 155 S.W.2d 617, 623, cols. 1 and 2.
The Eastland Court of Civil Appeals in the words of Justice Funderburk, viewed the question as new to the courts of this state:
"This is a novel and difficult question to which we find no conclusive answer in any of the decisions." 155 S.W.2d 617, 623, col. 2.
In holding that the vote of Mrs. Coffee should not be counted, the court stated that "* * * if a citizen discovers an error in his poll tax receipt he should take steps to have it corrected by the issuing authority before offering to vote in another district without change of residence." 155 S.W.2d 617, 623-624.
Major v. Loy was decided in 1941. Eight years later, in 1949, the San Antonio Court of Civil Appeals announced an exception to the rule of Major v. Loy that if a citizen discovers an error in his poll tax receipt and does not take steps to have it corrected, before offering to vote in another district without change of residence, the citizen's vote may not be accepted and counted.
In Tondre v. Hensley, Tex.Civ.App., San Antonio, 223 S.W.2d 671 (no writ), the San Antonio Court of Civil Appeals declined to extend the rule of Major v. Loy "* * * to disqualify voters from voting in a school district election when they actually live within the district, but because of confusion as to the location on the ground of voting precinct lines they have secured poll tax receipts bearing an incorrect voting precinct designation." 223 S.W.2d 671, 673, col. 2.
The court, speaking through Justice Norvell, definitely qualified the rule of Major v. Loy in this fashion:
"As pointed out in Major v. Loy, the statutory provisions relating to the issuance of poll taxes are designed to prevent election frauds. If voting in one part of the county were allowed upon a poll tax issued for a precinct in another part of the county without a change of residence, the possibilities of corruption are fairly obvious. However, it is a different matter when contiguous or near at hand voting precincts are involved and the poll taxpayer is mistaken as to the location of precinct lines and this confusion is also shared by the tax assessor-collector, the issuing authority for poll tax receipts. Voters should not be disqualified where uncertainty exists both in the minds of the tax assessor-collector and the voter as to where a precinct line runs." 223 S.W.2d 671, 673, col. 2.
This qualification of the broad rule of Major v. Loy was also made in 1958 in Vicars v. Stokely, Tex.Civ.App., San Antonio, 296 S.W.2d 599, writ ref., n. r. e., 157 Tex. 182, 300 S.W.2d 623. The court found that certain voters who lived in precinct 12, but with receipts showing they lived in precinct 16, had cast legal votes upon the finding that the error on the receipts was occasioned by an innocent mistake and confusion about the boundary lines. 296 S.W.2d 599, 604, col. 2.
In 1951 the San Antonio Court of Civil Appeals applied the rule of Major v. Loy to two voters who had knowingly for many years obtained their poll tax receipts for a wrong precinct for political and personal reasons and not by reason of an innocent confusion. Graham v. Villareal, Tex.Civ. App., San Antonio, 242 S.W.2d 258 (no writ). The court pointed out that these two voters were not confused and were not innocently mistaken, nor was the tax collector confused, as was the fact in Tondre v. Hensley, decided three years earlier. The two voters, like Mrs. Coffee in Major v. Loy, had knowingly for many years registered and voted in a precinct in which they did not live. Such was not the case with either the Pattersons or the Reeds.
*290 In Graham v. Villareal, the court reached the following conclusion:
"In other words, one who knowingly misrepresents the location of his precinct will not thereafter in the face of his fraud, be heard to say that he should be permitted to select his place of voting. We think the [trial] court correctly held, in effect, that the two voters in law had no poll tax receipts at all." 242 S.W.2d 258, 260, col. 1.
When the Reeds received their receipts, Reed told the deputy tax collector they lived in Silver. Reed told the deputy they were going to move to Robert Lee, and the deputy, acting on his own but for the collector, placed the Reeds in the wrong precinct. Instead of showing the Reeds to be residents of Silver, where the deputy knew they lived, and where they had lived and voted for fourteen years, the deputy showed the Reeds to be residents of a precinct they did not live in and one in which they had never lived. The tax collector testified he authorized a deputy to write a similar receipt for the Pattersons because it "would just save trouble."
At the time Major v. Loy was decided, and when Tondre v. Hensley, Graham v. Villareal and Vicars v. Stokely were decided, there was no statute in this state expressly providing a procedure to correct an erroneous tax receipt or for making an affidavit at the polls if correction had not been accomplished prior to an election. Provisions for both of these procedures were incorporated in Article 5.14 of the code by the legislature in 1963.
These provisions constitute the fifth grammatical paragraph of Article 5.14 reading as follows:
"When after issuance of a poll tax receipt or an exemption certificate, it is discovered that an error has been made in filling out the blanks on the receipt or certificate through mistake of the tax collector or through innocent mistake of the holder in supplying the information, the holder may present the receipt or certificate to the tax collector for correction and the tax collector shall correct the information on the original receipt or certificate and on the duplicate on file in his office. If the error has been in the voting precinct of the holder's residence and the regular list of qualified voters has already been prepared, upon correction of the error the tax collector shall place the holder's name on the supplemental list of qualified voters for the precinct in which he resides. No person shall be entitled to vote in a voting precinct of which he is not a resident. If an error in the voting precinct has not been corrected on the receipt or certificate at the time the holder offers to vote at an election, he may vote in the precinct of his residence, if otherwise qualified, by making and leaving with the presiding judge of the election an affidavit that he is a bona fide resident of that precinct and qualified to vote at that election, and that the error on the receipt or certificate was not caused by an intentional misrepresentation on his part; provided, however, that if the election judge is not satisfied as to his right to vote, his vote shall not be accepted unless he also complies with the provisions of Section 91 of this Code." [Article 8.09] Acts 1963, 58th Leg., ch. 424, sec. 26, p. 1017.
It will be noted that the basis for obtaining correction of an erroneous poll tax receipt is a showing that the error was a mistake of the tax collector, or came about through an innocent mistake of the voter in supplying information. Exercise of this right is optional with the taxpayer. No penalty is provided for failure to obtain a correction.
If the error has not been corrected by the time the voter presents himself at the polls in an election, he will be permitted to vote in the precinct of his residence by making the required affidavit as to residence and qualifications and "that the error on the *291 receipt * * * was not caused by an intentional misrepresentation on his part."
At the trial of this case the presiding judge of the Silver Peak election, Mrs. Ruby Hearn, was called as a witness and testified that she allowed the Pattersons and the Reeds to vote without making affidavits pursuant to Article 5.14. Her recollection was that the Pattersons and the Reeds did present their poll tax receipts, and Mrs. Hearn knew their names were on the Robert Lee (No. 1) poll list but not on the Silver (No. 8) list. Mrs. Hearn testified that she had known the Pattersons and the Reeds for ten years and knew they lived in Silver and knew the location of their homes in Silver.
It appears that Mrs. Hearn had lived in the Silver community a number of years. Until shortly before the election she had worked in the school system as a secretary. She had also been active in church work, and in school and civic affairs, with the result that she apparently knew personally all, or nearly all, of the voters presenting themselves at the polls on February 26, 1966. When asked whether she was personally acquainted with the people that lived in the community of Silver, Mrs. Hearn replied, "I believe that I am."
On cross examination, Mrs. Hearn testified that she had the poll lists at the polls and she knew the Pattersons and the Reeds were on the Robert Lee list. With reference to presentation of receipts by the Pattersons and the Reeds, and with respect to her failure to require affidavits, Mrs. Hearn gave testimony as follows:
"Q Now, when you got that list and when they came to vote, did they present their poll tax?
A Yes, sir, I believe they did.
Q And when those poll taxes that they presented showed them to be residents of Robert Lee and voters in Precinct No. 1 did you require them to make an affidavit and leave it with you that those poll tax receipts were in error and was not caused by an intentional misrepresentation on their part; did you require them to make that kind of affidavit?
A No, sir.
* * * * * *
Q And you didn't have them make an affidavit, and they didn't make one and leave it with you?
A No, sir.
Q And you don't have one?
A No, sir.
Q Nevertheless, you let them vote?
A Yes, sir.
* * * * * *
Q Would you have required them to make an affidavit if you had known it was the law?
A I assume that I may have.
Q You may have?
A Yes."
On direct examination Mrs. Hearn, after testifying as to her acquaintance for ten years with the Reeds and the Pattersons and her personal knowledge of their residence in Silver, was asked the question: "With this knowledge that you had, would it have made any difference to you as far as what you would have let them do if they had furnished you an affidavit setting forth these facts?" Mrs. Hearn's answer was, "No, sir."
The provisions of Article 8.07, V.A.T.S. Election Code, under which an affidavit of lost or mislaid poll tax receipt is required in lieu of presentation of the receipt, have been construed consistently against disqualification of the voter and against invalidity of his vote where the election official failed to demand the receipt or the affidavit.
*292 The Supreme Court held in Thomas v. Groebl, 147 Tex. 70, 212 S.W.2d 625, that Article 3004, R.S.1925, the source statute of Article 8.07, was directory and not mandatory. The Supreme Court cited and approved the holding of this Court in Ramsay v. Wilhelm, Tex.Civ.App., Austin, 52 S.W.2d 757 (writ ref.), that the statute did not purport to define qualifications of voters, but was intended for the guidance of election judges in testing qualifications of a voter. In Ramsay v. Wilhelm this Court held that failure of the voter, who had paid a poll tax, to present his receipt at the polls or make an affidavit, without demand by the election officials that he do so, did not disqualify the taxpayer to vote and did not render illegal his vote so cast. 52 S.W.2d 757, 759, col. 2.
As we have noted earlier, it is a well-established rule of construction that statutes regulating the right to vote should be given a liberal interpretation in favor of that right. Thomas v. Groebl, supra, and authorities cited, 212 S.W.2d 625, 630, cols. 1 and 2. Where the article itself contains no provision that ballots cast without compliance with the statute shall not be counted, the article is directory and not mandatory. Thomas v. Groebl, supra.
The courts of this state have uniformly held that ballots cast by legally qualified voters should be given effect, in the absence of fraud, unfairness in holding the election, or tampering with ballots or returns, even though election officials have failed to discharge their duties as prescribed by statute, unless there is clear provision in the statute itself that such ballots shall not be counted. Ramsay v. Wilhelm, supra, and authorities cited, 52 S.W. 2d 757, 760, col. 1. Cf. Article 13.42, V.A. T.S. Election Code.
We find no such provision with reference to votes cast by qualified electors when the provisions of Article 5.14 have not been complied with by the election officials, nor is there any such provision in Article 8.07 as construed by the courts of this state prior to or since enactment of Article 5.14 in 1963.
The cases construing Article 8.07 were decided long prior to the enactment in 1963 of the analogous Article 5.14 (fifth paragraph). The legislature is presumed to have taken notice of these cases, and the body of law they constitute, as a part of the law of the land at the time the legislature enacted the amendment of Article 5.14 to guide election judges in testing qualifications of voters holding tax receipts containing errors not caused by intentional misrepresentation of the voter. Humble Pipe Line Co. v. State, Tex.Civ.App., Austin, 2 S.W.2d 1018 (writ ref.).
Article 5.14 should be construed as not intending to deprive the elector of his right to vote for failure to have the tax receipt corrected, especially since no where in the statute is it said that such failure shall incur as a penalty the loss of the right to vote. Thomas v. Groebl, supra, 212 S.W.2d 625, 630, col. 2.
When the voter who has not obtained correction of the receipt before the election presents his receipt to the election judge at the polls, and the election official fails to demand the affidavit prescribed by Article 5.14, the statute should not be construed as intending to deprive the voter of the right to cast his vote and to have it counted, for the article imposes no such penalty. Ramsay v. Wilhelm, supra, 52 S.W.2d 757, 760, cols. 1, 2.
In Ramsay v. Wilhelm the court made the following observations, which we consider particularly relevant under the facts of this case:
"The Legislature has with particularity thrown numerous safeguards around the suffrage of the citizenship; and the manner, form, time, and place of its exercise. Of necessity, the holding of such elections are and must be intrusted to those not always conversant with the numerous provisions *293 of the law regulating same. As a result, all of such provisions are seldom complied with in every particular. But it is equally true that such failures on the part of election officials seldom defeat a fair expression of the popular will. Where they do not, the courts have been liberal in sustaining the result. Turner v. Teller (Tex.Civ.App.) 275 S.W. 115. Where such derelictions of the election officials have interfered with or prevented such a fair expression, or where there is any reasonable indication that such was the result, the courts have set them aside. But to enforce a strict observance of all of the directory provisions of the statute, absent proof of unfairness or dishonesty, would more often defeat than effectuate the popular will; and it is probable that but few elections would stand such a scrupulous test." (Emphasis supplied)
The Reeds and the Pattersons offered to vote in the precinct of their residence. Their tax receipts through error showed their residence to be in a precinct in which they did not live and in which they had never lived or voted. The error did not come about through any misrepresentation, intentional or otherwise, on their part. They were entitled to present their receipts, make the statutory affidavit, and then to vote in the Silver Peak election. The fact that the election officials, through misunderstanding of the law on their part, did not require the affidavits prescribed by Article 5.14, when the Reeds and Pattersons presented their receipts, did not disqualify the Reeds and the Pattersons to vote and did not render illegal the votes they cast. The judicial construction given Article 8.07 must be read into the analogous provisions of Article 5.14 enacted in 1963. Humble Pipe Line Co. v. State, supra. The four votes of the Pattersons and the Reeds were legally cast and were properly counted as valid in the Silver Peak election of February 26, 1966.
Appellants have challenged the votes of Mr. and Mrs. Wayne Drennan, who lived in one of the nine voting precincts in Coke County. Appellants contend the Drennans did not live within the Silver Peak school district where they voted.
Mr. Drennan testified that he and his family moved into a house, located on the Ralph Harris ranch on Section 6, Winfield Scott, in July, 1965, and continuously lived there up to and including the day of the election. He considered himself a resident of the Silver Peak school district. The presiding judge of the election, Mrs. Hearn, testified she was personally acquainted with the Drennans and the location where they lived, which she knew to be within the Silver Peak school district.
Contestants introduced at the trial a map used by the tax collector in collecting taxes for the Silver Peak school district and the Water Valley school district. The map showed the Winfield Scott survey, where the Drennans lived, to be outside the Silver Peak school district.
Mr. Jacobs, the tax collector, testified that he had traced the map from another map he found in the tax office when he went into the office in 1955. Tracings were made from time to time by him, but he did not make the original map, nor did he have in his office the field notes for the Silver Peak school district. Mr. Jacobs also testified that he did not use the map for issuing poll tax receipts. It was used only in collecting taxes for Silver Peak and Water Valley school districts.
Appellees introduced as documentary evidence minutes of the County Board of School Trustees and official records of school district field notes for Coke County to show that Survey No. 6, Winfield Scott, where the Drennans lived, was in the boundaries of Silver Peak School District as established May 22, 1929. No evidence contrary to the official records was offered by contestants, except the map used by the tax collector which was of uncertain origin.
*294 The trial court found that the Drennans were bona fide residents of the Silver Peak School district when they obtained their poll tax receipts and when they voted in the election. In an election contest the trial court is not only the judge of the credibility of the witnesses and the weight to be given their testimony, but it is also within the province of the court to reconcile the inconsistencies, if there be any, in the evidence brought forward. Day v. Crutchfield, Tex.Civ.App., Texarkana, 400 S.W. 2d 377 (writ dsmd.).
Appellants rely upon the holding in Del Rio Independent School District, etc. v. Aldrete, Tex.Civ.App., San Antonio, 398 S.W.2d 597 (writ dsmd.), in contending that the Winfield Scott survey, where the Drennans lived, by custom and usage had not been considered within Silver Peak school district and that this would be binding on the election officials and the courts. The evidence of custom and usage appellants offered was the map used by the tax collector for collection of taxes in two school districts.
In Del Rio Independent School District, etc. v. Aldrete doubt as to the boundary between two school districts did not arise until after the election. A survey then disclosed the presence of a vacancy, in which the citizens lived whose votes were questioned, resulting in a shift of the school district boundary about 276 feet. The court held that a statutory election contest was not a proper proceeding for establishing a new boundary line, and votes at the election would be counted according to the school district boundaries accepted before the survey uncovering the unsuspected vacancy.
In the case at bar, the tax collector, using a map of undetermined ancestry, collected taxes in a way that suggested the Drennans were not living in the Silver Peak school district. But the Drennans and the election judge believed the Drennans lived in the district, and the official records of the public body having power to fix school district boundaries sustained them in this belief. Appellants complain that there was no evidence offered to show that the county school trustees had not changed the boundary of Silver Peak since May, 1929, when, it was undisputed, Winfield Scott survey, where the Drennans lived, was within the Silver Peak district. If there had been a change in the boundaries subsequent to May, 1929, we think it reasonable that contestants would have willingly accepted the burden of proving the change, particularly if such proof would support the tax collector's map of unsettled lineage.
We conclude that Mr. and Mrs. Drennan had a legal right to vote in the Silver Peak election and that their votes properly were counted.
Under assignments of error 15 through 18 appellants contend the election of February 26, 1966, was illegal for a number of reasons, but principally because no valid election could be held after the decision of the federal district court on February 9 and prior to the close of the 15-day supplemental registration period ending March 18, 1966. Appellants contend that the call of the election, issued February 1, did not inform the public that qualified citizens, although not holding poll tax receipts, would be allowed to vote; that some persons who registered in March did not vote in February because they had not been properly notified; that failure to give proper notice resulted in use indirectly of the poll tax as a prerequisite to voting; that counting the ballots of voters in group 2, persons without poll taxes, violated the new Texas registration act signed by the Governor February 24; and that even if the new registration law was not effective on election day, the election was not a free election because the notices were addressed to "qualified voters," and even though persons without poll tax receipts or exemptions, but otherwise qualified, were allowed to vote, the public notices implied only "qualified voters" within the meaning of the laws controlling registration of voters for the *295 past ninety years would be able to vote, and this was no notice to persons without receipts or certificates, but otherwise qualified as voters.
We cannot agree with these contentions and overrule the assignments of error under which these points are presented.
The original stay order of the federal district court expired February 23. An application for an extension of the stay was pending, but had not been acted on prior to the day of the Silver Peak election. County and other local officials in charge of the election, not knowing whether a stay of the district court's judgment would be extended, made arrangements to receive the votes of all persons presenting themselves to vote, regardless of their prior registration or not, if they were otherwise qualified to vote.
At a hearing on motion of defendants for temporary stay of judgment, the United States District Court, sitting in Houston, stayed execution of its judgments on February 26 until March 26, 1966.
The motion for extension of the stay which had been expired February 23 recited that during the period from February 24 through March 25 an estimated 25 local bond elections would be held in Texas, as well as a considerable number of other local special elections, estimated to be at least twelve. The purpose of seeking a further stay of judgment, with respect to elections held between February 24 and March 2, as expressed in the motion, was to relieve election judges and other officials from being in contempt of the court unless they permitted all persons to vote who demanded to cast their vote, whether previously registered or not.
In response to the motion, after tender of reasons stated for granting the motion, the court ordered its judgment stayed, effective February 26, the day of the Silver Peak election.
We believe that by suspending its judgment the United States District Court made it unnecessary for the Silver Peak election officials to take the precaution of permitting both registered and unregistered persons to vote at the election. Moreover, in view of the recount conducted by the trial court, resulting in a tie vote in group 2, the materiality of these votes need not be considered any further. The recount showed ten accepted votes for consolidation and ten against in the group of persons not previously registered, but otherwise qualified to vote.
Mrs. Hearn, the presiding judge, testified that no one was denied the right to vote who came to the polls and asked for a ballot. One couple, Mr. and Mrs. Eason, did not vote, but this was because they decided not to make affidavit they had resided in the state for at least one year. Appellants offered no evidence that any other person failed to vote for any reason whatever, or that any voter was denied a ballot. It appears that compared to the biennial trustee elections of 1961, when 22 persons voted, and of 1965, when 18 voters participated, the Silver Peak election February 26 had a much larger turnout of the electorate, with approximately 150 voters casting ballots.
We have carefully examined and considered all of appellants' assignments of error. We believe that the election was fairly held, without any evidence of fraud or intentional wrong. Whatever oversights or mistakes were made by public officials or election officers did not result in denial of the ballot to any voter and did not invalidate the election. We overrule all of appellants' assignments of error, and conclude that the judgment of the district court should be in all things affirmed.
The judgment is affirmed.
Affirmed.

*296 DISSENTING OPINION
HUGHES, Justice.
This election was held at a time when there was a legal vacuum on the question of who were qualified electors. The laws requiring, with certain exceptions, the payment of a poll tax as a requirement for voting had been held unconstitutional by a three judge federal court, and the acts of the Legislature providing for registration of voters had not been in effect long enough for registration thereunder to be made.[1]
The election officials attempted to fill this gap by permitting any person who would have been a qualified elector had he paid his poll tax to vote. Commendable as this action was, it was wholly without sanction of law, and in my opinion does not help matters. These votes, so cast, were merely straw votes.
The notice of this election was directed to "Resident Qualified Electors" and it provided that "None but legally qualified voters * * * shall be entitled to vote."
This notice was dated February 1, 1966, before the federal court had invalidated the poll tax as a requirement for voting.
It seems to me that it is asking too much of the voting public to expect them to know who could or could not vote under these circumstances. If there is basis in this assumption, then the election was not a fair election.
The federal court poll tax decisions are now final. They are binding on this Court.
The rule generally is that an unconstitutional law is void ab initio and that no rights can be created under it. 16 Am.Jur. 2d, Constitutional Law, Sec. 177. There are exceptions to this rule, one of which is that equitable rights may be created under a statute subsequently held unconstitutional. Wichita County v. Robinson, 155 Tex. 1, 276 S.W.2d 509. If the election here had gone uncontested, equities would be created. This election has been timely contested and vigorously prosecuted, and no one could have relied upon its validity to their legal detriment. I believe an election should be held at which all duly qualified electors will have the legal right to vote.
I disagree with the majority also in its action in sustaining the validity of the votes of Mr. and Mrs. Wayne S. Reed.
Mr. Reed testified:
"Q Had you ever given your address and your voting precinct as Robert Lee before?
A No, sir.
Q Precinct 1 before?
A No, sir.
Q You had never done that before?
A No, sir.
Q You had always given it as Silver?
A Yes.
Q But this time you and your wife was your wife with you or did you get them for both of you?
A I got them for both of us.
Q And you gave it this time as Robert Lee?
A Yes, sir.
Q And the voting precinct No. 1?
A Yes."
Thus, Mr. and Mrs. Reed's poll tax receipts were issued showing their voting residence to be in Precinct 1, rather than in Precinct 8 where they voted in this election. Neither Mr. or Mrs. Reed made any effort *297 to have their poll tax receipts corrected as the law requires. Neither did Mr. or Mrs. Reed furnish an affidavit with the presiding judge of the election precinct where they voted. Art. 5.14, Vernon's Annotated Tex. Election Code, partially copied in the majority opinion.
The names of Mr. and Mrs. Reed were not on the poll list for the precinct in which they voted. See Art. 5.22 Election Code, supra.[2]
The majority sustains these votes primarily on the grounds that the statutes not complied with are directory, and that the Reeds and their place of residence were well known to the election officials.
In my opinion, the following cases require that these votes be invalidated: Major v. Loy, 155 S.W.2d 617, Tex.Civ.App. Eastland, n. w. h., Tondre v. Hensley, 223 S.W.2d 671, Tex.Civ.App. San Antonio, n. w. h., and Graham v. Villareal, 242 S.W. 2d 258, Tex.Civ.App. San Antonio, n. w. h.
In Major v. Loy, Mrs. Coffee's poll tax receipt showed her to be a resident of the Farmington Precinct. She voted in the Elmont School District and upon findings that she lived in that District the trial court sustained her vote. In overturning this ruling the Court stated:
"This question is posed: When one, subject to the payment of a poll tax, as an element of his qualifications to vote, presents his poll tax receipt showing his residence to be in another precinct than the one in which he offers to vote, may the election officers determine that the statement of the voter's residence as made in the poll tax receipt is the result of mistake and be authorized to find as a fact the voter's residence to be in the precinct in which he offers to vote and thereupon be authorized to accept and count such vote? This is a novel and difficult question to which we find no conclusive answer in any of the decisions.
The Constitution requires not merely the payment of a poll tax when due as one condition of the voter's qualification, but also that he hold a receipt showing that said poll tax was paid before the first day of February next preceding such election. Art. 6, sec. 2. Section 4 empowers the Legislature to make `regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot box.' Id. Art. 6, sec. 4. It is undoubtedly referable to this power that the Legislature has provided, among other things, that poll tax receipts shall show the voting precinct in which the poll taxpayer resides. R.S.1925, Art. 2965, Vernon's Ann.Civ.St. art. 2965. * * * Such is a part of the data deemed necessary to enable the tax collector to perform the further enjoined duty to furnish election officers with lists of poll taxpaying voters, etc., in each precinct. Id. Art. 2975, Vernon's Ann. Civ.St. Art. 2975. * * * These considerations lead us to the conclusion, that since the law imposes the duty upon a citizen in person or by agent to furnish to the tax collector information as to the precinct of his residence and makes provision for the passing on of such information by the tax collector to the election officers for their guidance, to the end of preventing fraud and preserving the purity of the ballot box, if a citizen discovers an error in his poll *298 tax receipt he should take steps to have it corrected by the issuing authority before offering to vote in another district without change of residence. It follows that in our opinion the vote of Mrs. Coffee should have been deducted from the total number cast for consolidation."
The majority distinguishes this case on the ground that the statute (5.14) has been amended (1963) since it was decided so as to provide two methods for avoiding the effect of the decision. It seems to me that the Legislature merely adopted the suggestion made in that opinion that the voter should have a mistake in his poll tax receipt corrected and provided a statutory method for doing so. Thus the need for correcting the mistake is emphasized by the amendment, not, as the majority holds, obliterated.
There is no need to decide in this case whether the Reeds could have truthfully made an affidavit that there was no "intentional misrepresentation" on their part so as to permit them to vote without having their poll tax receipts corrected for the reason that they made no such affidavit.
There is no question but that the Reeds knowingly requested and accepted a poll tax receipt showing their residence in a precinct in which they did not at the time reside. If this was not an "innocent mistake" on their part, then they could not have had their receipts corrected and they could not vote. There is no need to decide this question here because the Reeds made no attempt to correct their poll tax receipts.
I believe the decision in Major v. Loy is directly in point, and that the opinion of the majority is in conflict with it.
The opinion in Tondre v. Hensley, supra, was by Justice Norvell, now on our Supreme Court. It, too, was a school district consolidation election case. Tomas Lopez voted on a poll tax receipt showing his residence to be at a place in Voting Precinct No. 1 of Bexar County. No part of this precinct lay in District No. 29 where he voted. In holding this vote illegal, the Court said:
"It could hardly be said that any one could be so mistaken as to the location of the boundaries of these governmental subdivisions that he could reasonably believe that the address shown on the poll tax receipt was actually within the boundaries of the school district. The vote of Tomas Lopez should have been rejected upon authority of Major v. Loy, Tex.Civ.App., 155 S.W.2d 617.
* * * * * *
As pointed out in Major v. Loy, the statutory provisions relating to the issuance of poll taxes are designed to prevent election frauds. If voting in one part of the county were allowed upon a poll tax issued for a precinct in another part of the county without a change of residence, the possibilities of corruption are fairly obvious. However, it is a different matter when contiguous or near at hand voting precincts are involved and the poll taxpayer is mistaken as to the location of precinct lines and this confusion is also shared by the tax assessor-collector, the issuing authority for poll tax receipts. Voters should not be disqualified where uncertainty exists both in the minds of the tax assessor-collector and the voter as to where a precinct line runs."
This case was decided in 1949, before the amendments to Art. 5.14, noted above. I consider this case to be in point, and the majority opinion to be in conflict with it.
The opinion in Graham v. Villareal, decided in 1951, was by Justice Pope, now on our Supreme Court. We quote the following from that opinion:
"Benigna R. Rodriguez and Juan Rodriguez voted against dissolution, but their *299 votes were declared illegal by the trial court. By separate findings of fact, the court found that these persons lived within the water district, but that for many years they had purchased poll taxes for the purpose of voting outside of their precinct, and that their receipts in fact showed they lived outside the water district. The fact that their receipts showed they lived outside their true voting precinct was not occasioned by any confusion in their minds, nor in the mind of the tax collector who issued the receipts, but, according to evidence which was sufficient to support the trial court's holding, they had knowingly for many years obtained a poll tax receipt for a wrong precinct in order to cast their vote in a commissioners' precinct election. The evidence showed that even subsequent to the water district election and its investigation, Benigna Rodriguez, Juan's mother, had again purchased a poll tax receipt outside her correct precinct. Some of the evidence is conflicting, but there is ample evidence to support the conclusion that the two voters purchased their poll tax receipts for wrong precincts for political and personal reasons and not by reason of an innocent confusion. One who is innocently mistaken or has a bona fide confusion as to the location of precinct boundaries should not be and is not disfranchised so long as he in fact lives within the precinct where he presents himself to vote. Tondre v. Hensley, Tex.Civ.App., 223 S.W.2d 671. But, because one is not disfranchised when he makes an innocent mistake occasioned by a reasonable confusion of boundary lines, it does not follow that one who knowingly buys a poll tax receipt for a wrong precinct will be permitted to vote outside his precinct on the strength of his poll tax receipt and inside his precinct because that is where he should have voted. In other words, one who knowingly misrepresents the location of his precinct will not thereafter in the face of his fraud, be heard to say that he should be permitted to select his place of voting. We think the court correctly held, in effect, that the two voters in law had no poll tax receipts at all. Major v. Loy, Tex.Civ.App., 155 S.W.2d 617, imposes the burden upon the voter to have his poll tax receipt reflect the correct precinct information at the time he presents himself at the polls. This is required, as there stated, in the interest of preserving the purity of the ballot box. Tondre v. Hensley, supra, by this Court, grants an exception to that principle and relieves the voter from an onerous disfranchisement when he is innocently confused or there is a mistake occasioned by uncertainty of the true boundaries. We find no authorities which have pressed the exception so far, as is here contended, that we should permit the voters to knowingly buy outside their precinct for political and personal reasons but also vote inside their own precinct." (Italics mine)
The majority makes no attempt to distinguish this case except to say that it was decided before the 1963 amendment to Art. 5.14.
I consider this case to be directly in point, and that the opinion of the majority is in conflict with it.
In Vicars v. Stokely, 296 S.W.2d 599, Tex.Civ.App., San Antonio, writ ref. n. r. e., 157 Tex. 182, 300 S.W.2d 623, the Court, Justice Pope writing, in holding that ballots should not be counted where ballot stubs were not signed by the voter, stated:
"A voter must strictly conform to those things which he is required by statute to do. `The weight of authority is clearly in favor of holding the voter, on the one hand, to a strict performance of those things which the law requires of him, and on the other of relieving him from the consequence of a failure on the part *300 of election officers to perform their duties according to the letter of the statute where such failure has not prevented a fair election.' McCrary, Elections, (4th Ed.) § 724; Davis v. Walcott, Tex. Civ.App., 96 S.W.2d 817. To hold that a voter's signature on the stub is unnecessary would be to repeal the secret ballot law of Texas, which the Legislature has enacted."
Justice Norvell, for the Court, wrote on rehearing. Chief Justice Murray dissented.
The majority, brushing aside statute after statute and decision after decision, has affirmed this case without any authority to sustain it. If the opinion of this Court is to stand, then the Legislature should cease its effort to enact laws to preserve the purity of the ballot and to prevent fraud and corruption in elections because the courts will pay no attention to them.
"Courts must take statutes as they find them. More than that, they should be willing to take them as they find them." Justice Steakley quoting in Rudman v. Railroad Commission of Texas, 162 Tex. 579, 349 S.W.2d 717.
Appellants, in their brief, have eight points of error to the effect that certain findings of the trial court were so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust. If the majority has passed on these points, it has used the wrong standard. In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660.
I respectfully dissent. I would reverse this case and declare the election invalid. In the alternative, I would declare invalid the votes of Mr. and Mrs. Reed, and order that they be deducted from the appropriate totals as disclosed by an examination of their ballots.
NOTES
[1] The majority opinion refers to the contents of a motion filed in the Austin federal court case which is not in the record and to which I have not had access.
[2] Justice Simpson, dissenting in Thomas v. Groebl, 147 Tex. 70, 212 S.W.2d 625, stated:

"These poll lists occupy an important place in our election machinery. The statutes requiring the tax collectors to compile and the presiding judges at the elections to obtain and have at the polling places lists of the voters have been held mandatory, and an election governed by the general election statutes is not valid unless a poll list is prepared and furnished to the election officials. Arts. 2975 and 2993, R.S.; Yett v. Cook supra [115 Tex. 205, 281 S.W. 837]. Manifestly, it is of the greatest importance that these lists be as current and complete as the circumstances will admit."